[No. S066848. Feb. 25, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS RODRIGUEZ, Defendant and Appellant.

2

**COUNSEL**

Richard A. Levy, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc E. Turchin, Kenneth C. Byrne, Susan D. Martynec and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—Defendant Carlos Rodriguez was convicted of murder (Pen. Code, § 187, subd. (a); further statutory references are to this code unless otherwise indicated) and assault with a firearm (§ 245, subd. (a)(2)). The jury found defendant had used a firearm in the commission of both offenses. (§ 12022.5, subd. (a).) Defendant was sentenced to serve a total term of 42 years 4 months to life in state prison.

A divided Court of Appeal reversed defendant's conviction of both offenses. The majority concluded the trial court had erred prejudicially by excluding certain evidence offered to impeach the testimony of the eyewitness to the murder; it further held the record contained insufficient evidence the gun defendant used in the assault was loaded. In light of its disposition, the majority found it unnecessary to address certain other contentions defendant raised on appeal. The dissenting justice in the Court of Appeal disagreed with the majority that reversal of either conviction was warranted. We granted review, limited to the following issues: (1) whether the trial court erroneously excluded certain defense evidence offered for impeachment; and (2) whether there was sufficient evidence the gun was loaded to support the conviction for assault with a firearm.

As will appear, we conclude the Court of Appeal erred in reversing both the murder and the assault convictions. We therefore reverse the judgment of the Court of Appeal and remand the case to enable that court to address defendant's other appellate contentions.

FACTS

*Prosecution's evidence relating to the murder charge*

Tommy Merritt testified he lived in a five-story apartment building at 1830 North Cherokee in Hollywood. The neighborhood was "claimed" by the 18th Street gang, and residents often heard gunshots. Concerned the street was unsafe, Merritt had obtained permission from one of the managers of his apartment building to walk his dog on the roof. While doing so, about 1:30 a.m. on October 11, 1995, Merritt sat on the ledge of the roof looking into the apartment of a female impersonator (drag queen) on the opposite side of the street. On the street below were several other drag queens, pedestrians, and some traffic. Victim Valerie Sanchez, whom Merritt knew casually, was one of the pedestrians.

A car that was driving slowly and circling the block drew Merritt's attention. The right front passenger was leaning out of the window, heckling the drag queens. Merritt recognized the heckler as defendant, whom he had seen in the area many times over the previous three or four weeks. Defendant had a thick mustache, a goatee, and a mark on his left cheek. Although Merritt could not tell, from his vantage point, that the mark on defendant's cheek was the number 18, he knew from recent contact with defendant what

the mark was. Merritt also knew the number stood for the 18th Street gang, which controlled the neighborhood. The street was well lit that night with high-intensity security lights, and Merritt had no difficulty recognizing defendant. A police witness confirmed that the murder scene was well lit.

Merritt apparently turned to look at something else, but suddenly heard, from the vicinity of the car, a shout in Spanish (which he did not understand) and then a gunshot. He saw defendant leaning out of the passenger window, farther than he had been before, and cupping his hands as if he were holding something. Although Merritt did not actually see a gun, he did see two white flashes in front of defendant's hands and heard additional gunshots. Merritt grabbed his dog and lay down on the roof. He heard a car speeding away. After waiting a few seconds, he peered out into the street again and saw the victim staggering near the main gate of the building's parking lot. Merritt took his dog and hurried back to his apartment. Out of fear for his safety, he did not contact the police.

The victim, who had suffered a chest wound, died several hours later at a hospital.

Police officers investigating the crime scene shortly after the shooting recovered five spent .380-caliber semiautomatic handgun bullet casings from the middle of the street. At approximately the same time, an officer, in response to a radio call, went to a location approximately three blocks away from the scene of the shooting, where he found Anthony Gutierrez, bleeding from an apparent gunshot wound to his left hand, standing near a pay telephone. Gutierrez, nicknamed "Bullet," was known to be affiliated with the 18th Street gang, as was defendant, whose moniker was "Beto." Later on the morning of October 11, when Detective Pelletier interviewed Gutierrez, he noticed a large cast or bandage on his left forearm.

*Prosecution's evidence regarding the assault charge*

The following afternoon, while Merritt was walking his dog on the street near his apartment, a police officer called him over to ask questions about a U-Haul truck that was parked nearby. Merritt answered the questions but, out of fear for his safety, did not volunteer information about the previous day's shooting. Later that afternoon, a member of the 18th Street gang, whose moniker was "Pelon," approached Merritt and threatened to "kill [him] or kick [his] butt" if Merritt talked to the police. Merritt began to walk back toward his apartment when he saw defendant and Gutierrez leaving the building. Merritt approached Gutierrez, whom he knew to be an 18th Street gang member, to ask him to tell Pelon to leave him alone and to assure

Gutierrez he was not talking to the police about the shooting. Before Merritt could do so, defendant blocked his path, telling him he had nothing to ask Gutierrez and that he should return to his apartment. Merritt, however, continued to follow as defendant and Gutierrez walked away. Defendant raised his shirt, revealing a gun in his waistband. When Merritt remained standing in place, defendant took out his gun, put the barrel just under Merritt's chin, and told him to keep quiet because "I could do to you what I did to them." Frightened, Merritt returned to his apartment.

By the next day, Merritt decided it was time to "quit keeping my mouth shut" and "start at home to clean up the neighborhood." Accordingly, he contacted the police and told them about the shooting and the subsequent assault on him. He identified defendant in a "six-pack" photo array, and did so again at the preliminary hearing and during trial.

*Defense evidence*

Defendant mounted a two-pronged defense to the murder charge, attempting both to establish he was not in the car from which the shots were fired and to cast doubt on Merritt's eyewitness testimony by showing Merritt could not have seen all that he claimed to have seen from the roof of the apartment building.

Anthony "Bullet" Gutierrez testified to the following effect. He was affiliated with the 18th Street gang and, at the time relevant to this case, lived with his girlfriend Yolanda at 1830 North Cherokee in Hollywood (i.e., in the same building as Merritt). Defendant lived across the street with the victim, Valerie Sanchez, and another person, nicknamed "Cuba." Before the homicide, in the early morning hours of October 11, 1995, Gutierrez and defendant had gone to the Studio, a restaurant on Hollywood Boulevard at the corner of Cherokee, a short distance from where they both lived. About 1:20 a.m., they left the Studio and walked toward their residences. Various drag queens who regularly frequented the area were on the street. Sanchez was talking with a friend across the street from Gutierrez and defendant. She greeted them, crossed the street, came up behind them, and asked for a cigarette. As Gutierrez turned to give her a cigarette, shots rang out from somewhere behind him. The first shot hit Gutierrez; he felt the second shot pass by him and shatter a beer bottle in his hand. On the third shot, Gutierrez turned around and saw someone firing at him and his companions from outside a small, four-door Sentra-type car. Gutierrez and defendant dropped to the ground against a car. There were a total of five or six shots. Gutierrez noticed his hand was bleeding and heard Sanchez call to him and defendant. Gutierrez briefly went to the apartment of a neighbor, Talal "Tony" Al-Alusi, and then walked a half block to a car belonging to his friend Monica,

who drove him to the corner of Cahuenga and Yucca, where some other friends were located. He began to pass out; someone called an ambulance. Gutierrez gave police officers who arrived at the scene an incomplete explanation of how he came to be there, testifying that, because they were "harassing" him, he responded by "talking crap" to them.

After being treated at the hospital, Gutierrez was released about 5:30 a.m. and returned home to sleep. Later that day, he was awakened by police officers, who handcuffed him and transported him to the police station. There, Detective Pelletier interviewed him. Because Gutierrez did not like the way he was being treated, he was uncooperative.

The following day, October 12, Gutierrez slept until 5:00 or 6:00 p.m. He did not go outside during the daylight hours, did not leave the building with defendant, and did not see Merritt. Gutierrez went out in the evening and was "pretty sure" he saw defendant at that time, but he did not see him assault Merritt. Gutierrez testified he had never had any contact with Merritt.

On October 13, defendant was arrested in Gutierrez's presence. Gutierrez did not know at that time why defendant was being arrested. A week or more after the arrest, Gutierrez learned defendant was being charged with Sanchez's murder; he arranged a meeting with Detective Pelletier to tell him defendant was not responsible. Gutierrez explained he had not divulged what he knew during his previous interview with police because they had mistreated him, and proceeded to give a statement consistent with his testimony.

Talal "Tony" Al-Alusi generally corroborated Gutierrez's account. He also testified the police did not contact him after the killing. Al-Alusi contacted the public defender's office and spoke with defense investigator Douglas Urschel, providing a statement to the effect that defendant, Gutierrez, and Sanchez were walking toward him just before the shooting. Al-Alusi also scheduled, but did not keep, appointments with a police detective.

### Rebuttal evidence

The prosecution presented the testimony of various police officers in an effort to impeach Gutierrez by contradicting his testimony in certain particulars and pointing out inconsistencies between his testimony on the stand and his statements on earlier occasions.

## ISSUES ON REVIEW

### Effect of exclusion of defense evidence offered for impeachment

The defense sought to call as a witness one of the managers of the apartment building in which Merritt lived, in an effort to impeach Merritt's

testimony that he had witnessed the murder from the roof of the building while walking his dog. To explain his presence on the roof, Merritt had testified: "At night time some of us feared going out on the street because of the activity, so we asked our manager if we could let the dogs do their business on the roof, and *he* said yes." (Italics added.) A husband and wife shared the building management duties. The defense sought to present the wife's testimony that tenants were not allowed to use the roof, that she had not given Merritt permission to walk his dog there, and that she had no information he had done so. She also would have testified, according to defense counsel, that because the roof was off-limits, the maintenance man was not required to clean it. Defense counsel also suggested she might testify she had been on the roof and had not noticed excrement or urine stains. The prosecutor timely objected to such testimony as irrelevant, collateral and unduly time-consuming.

Observing that the real issue was whether Merritt was on the roof when he said he was, not whether he had permission to be there, the trial court excluded the female building manager's proposed testimony as irrelevant and collateral impeachment. The court also concluded any testimony she might have given to the effect that she had not seen dog excrement or urine stains would have been cumulative. (Defense investigator Urschel had testified he had been on the roof and seen no such residues.)

Defendant argues the court's ruling was prejudicially erroneous; the Court of Appeal agreed and, accordingly, reversed the murder conviction. We conclude the Court of Appeal erred.

■ A collateral matter has been defined as "one that has no relevancy to prove or disprove any issue in the action." (1 Jefferson, Cal. Evidence Benchbook (3d ed. 1997) §§ 27.105, 27.106, pp. 478-479.) A matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue; always relevant for impeachment purposes are the witness's capacity to observe and the existence or nonexistence of any fact testified to by the witness. (Evid. Code, § 780, subds. (c), (i); *People* v. *Lang* (1989) 49 Cal.3d 991, 1017 [264 Cal.Rptr. 386, 782 P.2d 627].) ■ As with all relevant evidence, however, the trial court retains discretion to admit or exclude evidence offered for impeachment. (Evid. Code, § 352; *People* v. *Douglas* (1990) 50 Cal.3d 468, 509 [268 Cal.Rptr. 126, 788 P.2d 640].) A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse (*People* v. *Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365]) and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest

miscarriage of justice (*People* v. *Jones* (1998) 17 Cal.4th 279, 304 [70 Cal.Rptr.2d 793, 949 P.2d 890]).

■ Here, the trial court did not abuse its discretion in excluding the proffered impeachment testimony by the female apartment manager. As the trial court observed, the relevant issue in the case was whether Merritt was actually on the roof at the time of the murder. The manager's testimony that she had not granted Merritt permission to use the roof plainly had little, if any, tendency in reason to prove that Merritt in fact had not gone on the roof and, hence, that he testified untruthfully.[1] (See Evid. Code, § 210.) First, the manager's testimony did not directly meet Merritt's testimony. Using the masculine pronoun, Merritt testified, in effect, that a male apartment manager had allowed him to walk his dog on the roof; the proffered testimony of the female manager did not encompass the question of whether her husband and co-manager had granted such permission. Second, the proffer did not demonstrate any personal knowledge, on her part, of whether Merritt had gone on the roof. (See Evid. Code, § 702.) That she possessed, as counsel represented, no information Merritt *had* done so did not impeach Merritt's testimony that he had. Finally, counsel's representation the female manager "might" testify she had herself gone on the roof and had noticed no trace of dog excrement or urine stains was both uncertain and vague as to the time of any such observations. Consequently, the trial court did not abuse its discretion in excluding the proffered testimony.[2] *People* v. *Lang, supra,* 49 Cal.3d at page 1017, cited by defendant, is not to the contrary, as the impeachment evidence in that case went directly to the defendant's mental state at the time of the shooting. It follows that the Court of Appeal erred in reversing defendant's murder conviction for erroneous exclusion of evidence.

Because we conclude the trial court did not abuse its discretion in excluding the proffered testimony on grounds of irrelevance, we need not determine whether the testimony could properly be characterized as "collateral," and we have no occasion to address the question of prejudice flowing from the ruling.

*Sufficiency of evidence to support the assault conviction*

■ As noted above, the Court of Appeal reversed defendant's assault conviction due to what it viewed as the absence of evidence the gun was

---

[1]Otherwise, by way of extreme example, if the existence of a prohibition constituted evidence that the prohibited act was not done, then the existence of the Penal Code logically would constitute evidence that crimes are not committed.

[2]To the extent defendant may be understood to raise a constitutional challenge to the trial court's ruling, such a challenge would lack merit. (See *People* v. *Cudjo* (1993) 6 Cal.4th 585, 611 [25 Cal.Rptr.2d 390, 863 P.2d 635] [application of ordinary rules of evidence generally does not impermissibly infringe on an accused's right to present a defense].)

loaded or that defendant had attempted to use it as a club or bludgeon. The court reasoned that, absent any such evidence, the proof was insufficient of assault with a firearm, which requires the present ability to inflict a violent injury. (§ 240; see *People* v. *Mosqueda* (1970) 5 Cal.App.3d 540, 544 [85 Cal.Rptr. 346].)[3]

■ In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 317-320 [99 S.Ct. 2781, 2788-2790, 61 L.Ed.2d 560].) The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People* v. *Stanley* (1995) 10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' " (*Id.* at pp. 792-793.)

■ The Court of Appeal's majority opinion gives no indication that court followed this well-established methodology of appellate review. The opinion does not refer to any standard of review, nor does it explain how, in the majority's view, the normal presumption favoring the judgment was

---

[3]A long line of California decisions holds that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person. (*People* v. *Fain* (1983) 34 Cal.3d 350, 357, fn. 6 [193 Cal.Rptr. 890, 667 P.2d 694]; *People* v. *Sylva* (1904) 143 Cal. 62, 64 [76 P. 814]; *People* v. *Lee Kong* (1892) 95 Cal. 666, 668-669 [30 P. 800]; *People* v. *Valdez* (1985) 175 Cal.App.3d 103, 111 [220 Cal.Rptr. 538].) The continuing viability of this rule is not questioned in this case, and the parties' briefs do not address it. Rather, we address the required quantum of circumstantial evidence necessary to demonstrate present ability to inflict injury and thus to sustain a conviction of assault with a firearm.

overcome. Although the opinion acknowledges most of the pertinent evidence the jury must have considered in arriving at a verdict of guilt on the assault charge, the majority failed to view that evidence in the light most favorable to the judgment. Rather, in reversing defendant's conviction, the majority focused on what it found *lacking* in the prosecution's case and the strength of the inferences it drew from the evidence presented, rejecting contrary (but, in our view, equally logical) inferences the jury might have drawn. In so doing, the majority essentially acted as an appellate fact finder and thereby deviated from its appropriate role.

The Attorney General argued below that the jury could have inferred the gun was loaded because defendant had shot Sanchez the previous day and because defendant, a gang member, logically would not carry an unloaded gun in an area where gang violence was prevalent. The Court of Appeal majority found that these facts did not constitute evidence defendant's gun was loaded. It observed that the gun used to shoot Sanchez was never found and concluded the gun defendant used to threaten Merritt likely was not the gun used in the homicide, since logically defendant would have disposed of a murder weapon. The majority's reasoning, however, amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were no more inherently speculative than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury.

The Court of Appeal majority, moreover, failed to appreciate the significance of certain other evidence. As noted, Merritt testified that when defendant put the gun to his chin, he warned Merritt to keep his mouth shut or "I could do to you what I did to them." The majority saw this testimony as pertaining only to the irrelevant question of whether defendant had made a punishable threat, and so apparently dismissed it from consideration on the issue of sufficiency of the evidence. In fact, however, the jury could reasonably have interpreted the warning as an admission by defendant of his present ability to harm Merritt. As such, it was highly relevant to, and supportive of, the assault charge.

■ California courts have often held that a defendant's statements and behavior while making an armed threat against a victim may warrant a jury's finding the weapon was loaded. For example, in *People* v. *Montgomery* (1911) 15 Cal.App. 315 [114 P. 792] (*Montgomery*), the Court of Appeal, in the absence of direct evidence the gun used in the offense was loaded, and despite the defendant's own testimony it was not, held the jury was entitled, under the circumstances of the case, to reject contrary testimony and find the

gun was loaded. (*Id.* at pp. 317-319.) The court noted the defendant was enraged when he left a fight and that he returned with a gun he leveled at the victim, declaring, "I have got you now." (*Id.* at p. 318.) These words, the court reasoned, would be meaningless unless the weapon were loaded. (*Ibid.*)

Similarly, in *People* v. *Mearse* (1949) 93 Cal.App.2d 834, 836-838 [209 P.2d 960] (*Mearse*), the Court of Appeal, in rejecting a sufficiency of evidence challenge to an assault conviction, concluded the defendant's command to the victim to halt or "I'll shoot" indicated the gun was then loaded. "The acts and language used by an accused person while carrying a gun may constitute an admission by conduct that the gun is loaded." (*Id.* at p. 837; cf. *People* v. *Hall* (1927) 87 Cal.App. 634, 636 [262 P. 50] (*Hall*) [robbery prosecution: "The defendant's acts and the language used by him in the commission of the robbery constituted an admission by conduct, an implied assertion that the gun was loaded"].)

 Defendant cites factual differences between, on the one hand, *Mearse, Montgomery, Hall,* and other cases discussed in the Attorney General's brief and, on the other, this case, but none of the cited distinctions alters either the basic principle that we glean from the cases or its import for this case: A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon. We cannot say the jury could not reasonably make such a determination here.

The Court of Appeal in the present case relied on *People* v. *Bekele* (1995) 33 Cal.App.4th 1457 [39 Cal.Rptr.2d 797] (*Bekele*). In *Bekele,* two men noticed the defendant burglarizing a pickup truck belonging to one of them. The two men confronted the defendant, who began to flee. The men, pursuing, saw the defendant tug twice at his jacket and produce a gun. Pointing the gun at one of the men, the defendant said, "Don't." A short time later, the defendant was found in a homeless encampment; the gun was never recovered. (*Id.* at pp. 1460, 1463.) The Court of Appeal in *Bekele* reversed the defendant's assault conviction. It interpreted the evidence of the defendant's manner of retrieving the gun from his clothing as lending no support to an inference the gun was loaded. The *Bekele* court also declared that nothing in the defendant's conduct, described by the witness, indicated any special care in the handling of the weapon, as if from a concern to avoid self-injury. (*Id.* at p. 1463.) Like the decision under review, the published portion of *Bekele* did not refer to the standard of review for claims of insufficiency of evidence or explain how the normal presumption favoring the judgment was overcome. It is apparent the *Bekele* court committed the same error as did the Court of Appeal in the present case: It simply reviewed the evidence

considered by the jury and drew therefrom different inferences. Accordingly, we disapprove *Bekele* to the extent it engages in appellate factfinding.

Finally, the Court of Appeal majority in the present case found it significant that defendant had not armed himself and gone hunting for Merritt, and that no evidence suggested defendant was planning or engaging in any criminal activity when he encountered Merritt. While such circumstances might tend to support a conclusion contrary to that reached by this jury, their absence does not so undermine the jury's reasoning as to warrant overturning its verdict. (See *People* v. *Stanley, supra,* 10 Cal.4th at pp. 792-793.)[4]

## CONCLUSION

The judgment of the Court of Appeal is reversed, and the cause is remanded to that court for resolution of defendant's appellate claims not previously addressed.

George, C. J., Baxter, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Dissenting.—Reversing the Court of Appeal, the majority upholds the trial court's exclusion of proposed defense testimony. Unlike the majority, I find the excluded testimony to be relevant. In my view, the exclusion was prejudicial error, and therefore I would reverse the judgment.

## I.

Because of the importance of the facts here, I recite them in detail.

At 1:30 a.m. on October 11, 1995, Valerie Sanchez was the victim of a drive-by shooting in a Hollywood neighborhood "claimed" by the 18th Street gang. She died at a hospital a few hours later. There was no physical evidence linking anyone to the murder. Defendant was convicted solely on the basis of testimony by the prosecution's star witness, Tommy Merritt.

This was Merritt's testimony: At the time of the murder, Merritt lived in a five-story apartment building at 1830 North Cherokee in Hollywood. At 1:30 a.m. on October 11, 1995, he was walking his dog on the roof of the apartment building. The street below was well lit. He noticed a car circling the block several times. A passenger was leaning out of the window. Based

---

[4]In light of our conclusion, we need not address the Attorney General's argument that we should recognize a rule of convenience excusing the prosecution from presenting proof the gun was loaded, a fact he asserts was peculiarly within defendant's knowledge. (Cf. *In re Shawnn F.* (1995) 34 Cal.App.4th 184, 197-199 [40 Cal.Rptr.2d 263] [recognizing rule of convenience pertaining to question whether minor possessed a driver's license].)

on the passenger's mustache, goatee, and a mark on his left cheek, Merritt recognized the passenger as defendant, whom he had seen on previous occasions.

As Merritt was looking away from the street, he heard a shout in Spanish and then a gunshot. When he looked down at the street, he saw defendant leaning out of the passenger window with his arms extended. Merritt did not see a gun, but he saw two white flashes coming from defendant's hands. Merritt ducked below the ledge of the roof. He heard more gunshots and the sound of a car speeding away. He then looked over the roof's edge and saw victim Sanchez staggering on the street below. Merritt went back to his apartment; he did not call the police.

The next day, October 12, Merritt was outside when a police officer asked him about a truck parked nearby. Merritt responded to the questions; he did not mention the shooting. Later that afternoon, "Pelon," a member of the 18th Street gang, came up to Merritt on the street and threatened to hurt him if Merritt talked to the police. As Merritt walked back to his apartment building, he saw defendant with Anthony Gutierrez, an 18th Street gang member. Merritt approached Gutierrez to assure him that he would not talk to the police about the shooting and to ask Gutierrez to tell Pelon to leave him alone. But defendant stepped in front of Merritt and told him to return to his apartment. When Merritt continued to follow defendant and Gutierrez, defendant raised his shirt, revealing the handle of a gun tucked into his waistband. Defendant then put the barrel of the gun under Merritt's chin and told him to keep his mouth shut or "I could do to you what I did to them." Merritt went back to his apartment. The next day, he mentioned this incident and the shooting to the police.

On cross-examination, defense counsel asked Merritt: "Did you often go up [on the roof] because you knew that 18th Street [gang] did not congregate on the roof?" Merritt answered: "At night time some of us feared going out on the street because of the activity, so we asked our manager if we could let the dogs do their business on the roof, and he said yes."

Defense witness Anthony Gutierrez testified that he lived in the same apartment building as Merritt, and that defendant Carlos Rodriguez lived across the street with Valerie Sanchez (the murder victim) and someone nicknamed "Cuba." Shortly before the shooting, while defendant and Gutierrez were walking home, Sanchez met them and asked for a cigarette. As Gutierrez was handing her a cigarette, a bullet struck his hand. He then saw someone shooting at defendant and him from outside a small car. To protect themselves, Gutierrez and defendant dropped to the ground beside a parked

car. After the shooting, Gutierrez stayed briefly at the apartment of Talal Al-Alusi, a friend, and then walked to another friend's car half a block away. The friend drove Gutierrez to a street corner where he met some other friends. When Gutierrez lost consciousness as a result of the injury to his hand, Gutierrez was taken to a hospital and released at 5:30 that morning. The next day, October 12, 1995, Gutierrez did not leave his apartment during the day; he had no contact with Merritt and did not see defendant assault Merritt.

Defense witness Talal Al-Alusi testified that defendant, Gutierrez, and Sanchez were walking towards him just before the shooting on October 11, 1995.

Defense investigator Douglas Urschel testified that he had been on the roof of the apartment building on May 2, 1996. He stated that the roof was clean, that there was no evidence of recent cleaning, and that there was no evidence that dogs had been on the roof.

Defense witness Tom Savich testified that he lived on the third floor of the apartment building. In the early morning hours of October 11, 1995, after hearing gunshots and moaning, Savich looked out the window and saw a woman lying on the sidewalk and two men leaning against a car. He also saw a man leaning out of the passenger window of a car, but he could not distinguish faces on the street because he was looking down from a third floor window.

The defense attempted to call as a witness "Sally," who with her husband was a co-manager of the apartment building. The prosecution objected. Saying "my bailiff has a train to catch," the trial court expressed its desire to address the matter "real quickly." Outside the jury's presence, defense counsel then made this offer of proof of Sally's anticipated testimony:

"Let me see if I can find the statement. Basically, [defense investigator] Urschel took a statement from her. Here it is. No one was permitted to walk their dogs on the roof. She stated she knew of no one who had walked their dogs on the roof.

"She knew Tommy Lee Merritt and had never given Mr. Merritt permission to walk his dog on the roof nor had any information that he ever had.

"Now, she works with her husband, I guess, as managers of the building, and I believe Mr. Merritt had testified that he had asked the manager's approval to walk his dog on the roof. She said she would deny any permission to any tenant to walk their dogs on the roof.

"Now, I advised the court and counsel there were some other things she also said. One thing I may not have mentioned. It just came to light concerning that is that when tenants routinely move in the building, when tenants move into the building, they always ask to go up on the roof and use it for sunbathing, and she denies anybody the right to use the roof in any way whatsoever.

"So I think it's probative to show that impeaches Mr. Merritt. She also said that the one-man cleaning crew does not have, as part of his duties, doing anything up on the roof because no one is supposed to be on the roof.

"[The Court] That's it?

"[Defense counsel] She may have said—I don't recall—I will ask her tomorrow whether she had been on the roof. I think she said she might have been there and never noticed any dog excrement or urine stains.

"I specifically remember asking her, if she'd go up there specifically when non-compliant people may be drinking beer. Her husband went up to get the people down and to collect the beer bottles. So I know she goes up on the roof proximity, and the right to whether Merritt had, there's no corroboration he had it."

The trial court ruled that the defense could not present co-manager Sally's proposed testimony to the jury, stating the defense was trying to impeach Merritt on a collateral matter. The court also characterized Sally's proposed testimony as cumulative. A majority of the Court of Appeal reversed defendant's conviction for the murder of Valerie Sanchez, holding that the trial court's exclusion of the testimony was prejudicial error. The court also reversed defendant's conviction for assault with a firearm because of insufficient evidence that the gun was loaded at the time of the assault.

This court granted the Attorney General's petition for review. Our February 25, 1998, order granting review limited the issues before this court to: "(1) whether the trial court erroneously excluded defense evidence offered for impeachment on a collateral matter, and (2) whether there was sufficient evidence that the gun was loaded to support the conviction for assault with a firearm." The majority does not address whether the trial court erred in excluding the defense evidence as attempted impeachment on a *collateral* matter. (Maj. opn., *ante*, at p. 10.)[1] Instead, the majority reverses the Court of Appeal's judgment as to the murder conviction on the ground that the

_____

[1]In my view, the trial court did err in excluding the proposed testimony as impeachment on a collateral matter. The collateral-matter limitation on attacking the credibility of witnesses

defense evidence was *irrelevant*. (Maj. opn., *ante*, at p. 10.) I disagree. The evidence was relevant and its exclusion was prejudicial error.

## II.

Unless excluded by statute, all relevant evidence is admissible. (Cal. Const., art. I, § 28, subd. (d); Evid. Code, § 351.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Relevant evidence includes not only evidence of the *ultimate* facts in dispute but also evidence of *intermediate* facts, that is, facts from which the ultimate fact may reasonably be inferred. (Cal. Law Revision Com. com., 29B pt. 1 West's Ann. Evid. Code, *supra*, foll. § 210 at p. 23; 1 Jefferson, Cal. Evidence Benchbook (3d ed. 1997) § 21.16, p. 298; *id.*, § 21.19, p. 298; see *People* v. *Hill* (1992) 3 Cal.4th 959, 987-988 [13 Cal.Rptr.2d 475, 839 P.2d 984].) "An inference is a deduction of fact

applies when an examiner elicits "otherwise irrelevant testimony on cross-examination merely for the purpose of contradicting it." (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 748 [60 Cal.Rptr.2d 1, 928 P.2d 485]; accord, *People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77]; see also Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 780 at pp. 586-587 ["The so-called 'collateral matter' limitation on attacking the credibility of a witness excludes evidence relevant to credibility unless the evidence is independently relevant to the issue being tried."].) For instance, if defense counsel had asked Merritt about his dog's age, or whether the dog was licensed, the trial court could properly have excluded evidence offered to show that Merritt had falsely answered these questions, because they concerned facts having no conceivable relevance to the charges being tried. But, as I explain in the text, whether tenants in general and Merritt in particular had permission to walk their dogs on the roof, and customarily did so, were questions that were independently relevant to the issue being tried. For if Merritt testified falsely on these points, a jury could reasonably infer that he was not in fact on the roof at the time of the shooting and had testified falsely about his identification of defendant.

Nor could the trial court properly exclude co-manager Sally's proposed testimony as being merely cumulative. Whether the trial court relied on this basis in excluding the evidence is unclear. At one point, the reporter's transcript has the trial court stating: "I think the evidence is cumulative. Had the evidence been basically he walks the dog on the street, not on the roof, so it's cumulative as to that evidence." The statement is so unintelligible that one can only conclude that the court misspoke or the reporter did not transcribe the court's words accurately. In any event, none of Sally's proposed testimony was cumulative because no witness testified to the facts asserted in the offer of proof. No witness testified that tenants were not permitted to walk dogs on the roof, that Sally had not given Merritt permission to be on the roof, or that she had no knowledge that Merritt had ever walked his dog on the roof. Although Sally's proposed testimony that she never noticed any dog excrement or urine stains on the roof overlapped to some extent defense investigator Urschel's testimony that there was no evidence that dogs had been on the roof, the proposed testimony was not merely cumulative even on that one point because Urschel's inspection of the roof was limited to a single occasion more than six months after the shooting, whereas defense counsel's offer of proof suggested that co-manager Sally had inspected the roof periodically and might well testify to observations around the time of the shooting.

that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).)

Here, the identity of the killer is the *ultimate* fact. Whether Merritt was on the roof of the five-story apartment building and could perceive and identify the killer on the street below is an *intermediate* fact. (Evid. Code, § 780, subds. (c), (d).) The trial court excluded proposed defense evidence by co-manager Sally that at the time of the shooting (1) Merritt and other tenants were not allowed on the roof, (2) Sally had never given Merritt permission to walk his dog on the roof and to her knowledge Merritt had never walked his dog on the roof, and (3) there was no evidence of dogs having been on the roof. Through this testimony the defense sought to impeach Merritt and show that he was not on the roof when he said he was. The proposed testimony was relevant because it had a "tendency in reason" to disprove a disputed material fact: Merritt's claim that he was walking his dog on the roof at the time of the shooting. The proposed testimony called into question the veracity of Merritt's claim that "some of us," that is, a number of the building's tenants, had permission to walk dogs on the roof of the apartment building.

The majority criticizes defense counsel's offer of proof as uncertain and vague based on counsel's statement that Sally "might" testify that she herself had been on the roof to determine the presence of dogs on the roof. (Maj. opn., *ante*, at p. 10.) Although this part of the offer did not precisely describe Sally's anticipated testimony in this regard, the offer of proof was sufficient. Defense counsel's offer of proof "made known to the court" (Evid. Code, § 354, subd. (a)) co-manager Sally's proposed testimony, suggesting that she had inspected the roof periodically. As I noted earlier, the trial court was in a hurry and wanted to have the matter addressed "real quickly." To criticize defense counsel for using the word "might" under these circumstances is, I think, unfair.

I find unconvincing the majority's primary reason for concluding that co-manager Sally's testimony was irrelevant. Merritt testified that Merritt and others had asked "our manager" for permission to walk their dogs on the roof "and *he* said yes." (Italics added.) Seizing on the word "he," the majority reasons that because the proposed defense testimony was to come from co-manager Sally, it does not "directly meet" the issue of whether her husband and co-manager had granted tenants permission to walk dogs on the roof. (Maj. opn., *ante*, at p. 10.)

Presumably a husband and wife who co-manage an apartment building where they also reside discuss decisions regarding management of the

property. It could thus be reasonably inferred that Sally and her husband did not announce and enforce flatly contradictory policies as to use of the apartment building's roof. Thus, if the jury had been allowed to hear co-manager Sally's testimony, it would have been presented with a conflict between the inference that Merritt had permission to be on the roof and therefore was on the roof at the time of the shooting and the inference that Merritt did not have permission to be on the roof and therefore was not on the roof. It is for the jury as the trier of fact, not the court, to resolve any conflict between inferences. (*Juchert* v. *California Water Service Co.* (1940) 16 Cal.2d 500, 503 [106 P.2d 886]; *Hoch* v. *Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 59 [29 Cal.Rptr.2d 615]; see 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 370, pp. 420-422.) Here, by upholding the trial court's exclusion of the proposed defense testimony, the majority has taken it upon itself to resolve a factual conflict, thus usurping the jury's function as trier of fact. (Evid. Code, § 312, subd. (b) [jury determines credibility of witnesses]; *Hoch* v. *Allied-Signal, Inc., supra,* 24 Cal.App.4th at p. 59 [resolution of conflicting inferences and weighing of opposing evidence is for jury].)

The majority criticizes defendant's offer of proof for failing to show that co-manager Sally had personal knowledge that Merritt was not on the roof of the apartment building at the time of the shooting. (Maj. opn., *ante,* at p. 10.) Evidence Code section 702 requires a witness to have personal knowledge of the subject matter of the witness's testimony. Here, Sally's proposed testimony was that tenants are not permitted to walk their dogs on the roof of the apartment building, to her knowledge no one had done so, and she had never given a tenant permission to use the roof for any purpose. These were matters within her personal knowledge.

Because of my conclusion that the exclusion of the proposed defense testimony was error, I now turn to the question of whether the error was prejudicial to defendant.

### III.

When, as here, a trial court commits an evidentiary error, "the applicable standard of prejudice is that for state law error, as set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (error harmless if it does not appear reasonably probable verdict was affected)." (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 611 [25 Cal.Rptr.2d 390, 863 P.2d 635].) In my view, the trial court's exclusion of the proposed defense testimony here was error that affected the verdict, requiring reversal of the judgment.

The evidence presented to the jury was sharply conflicting. The testimony of defense witnesses Gutierrez and Al-Alusi that defendant was not in a car but was walking on the street at the time of the shooting tends to contradict the testimony of Merritt, the prosecution's star witness. Merritt claimed that while walking his dog on the roof of a five-story apartment building at 1:30 in the morning and looking at the street below, he saw defendant lean out of a moving car; Merritt recognized defendant's mustache, goatee, and even such detail as a mark on his left cheek, yet he could not see a gun in defendant's hand. Compare this with the testimony of defense witness Tom Savich, who witnessed the same event as Merritt at the same time as Merritt from the same building as Merritt, but from the third floor instead of the roof above the fifth floor. Savich said that he saw a car with a passenger leaning out of the window, but that because he was looking down from the third floor to the street he could not make out the features of people on the street.

The record discloses that Merritt's testimony troubled the jury, which deliberated for two and one-half days before reaching a verdict. Jury deliberations began at 10:55 a.m. on Friday, May 10, 1996. At 12:00 noon, the jury asked for a copy of Merritt's testimony. When the jury, which apparently was not given a copy of Merritt's testimony, reconvened to deliberate on the following Monday morning, it asked that Merritt's testimony be read to it. After the reading, the jury continued deliberations. It did not reach a verdict until the next day.

Given the sharp conflict in the evidence, the length of the jury's deliberations, and its concern with prosecution witness Merritt's testimony, it is reasonably probable that the trial court's error affected the verdict. If the jury had heard co-manager Sally's testimony, there is a reasonable probability that it would not have credited Merritt's testimony that he was on the roof of the five-story apartment building when the 1:30 a.m. shooting occurred. If the jury had not believed that Merritt was on the roof of the building during the shooting, it probably would not have believed his testimony that he saw defendant shoot Valerie Sanchez on the street.

In turn, it is reasonably probable that had the jury heard co-manager Sally's testimony, it would also have disbelieved Merritt's testimony about defendant's assault on him. The trial court correctly instructed the jury that a witness willfully false in a material part of his testimony is to be distrusted in others, and that it could reject the whole testimony of such a witness. (CALJIC No. 2.21.2; *People* v. *Allison* (1989) 48 Cal.3d 879, 895 [258 Cal.Rptr. 208, 771 P.2d 1294].) If the jury had rejected Merritt's testimony about the murder, it is reasonably probable that it would not have credited Merritt's testimony about defendant's assault on him.

I would affirm the Court of Appeal's judgment reversing defendant's conviction for murder and assault with a firearm.

Mosk, J., concurred.