Filed 7/29/14  P. v. Gonzalez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JONATHAN GONZALEZ,<br><br>　　　Defendant and Appellant. | B249092<br><br>(Los Angeles County<br>Super. Ct. No. NA092996) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary J. Ferrari, Judge.  Affirmed as modified.

Katharine Eileen Greenebaum, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant, Jonathan Gonzalez, appeals his conviction for three counts of assault with a firearm, with prior prison term and prior serious felony conviction findings (Pen. Code, §§ 245, 667.5, 667, subds. (b)-(i)).[1] He was sentenced to state prison for a term of 70 years to life.

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

About 1:35 a.m. on July 12, 2012, Carrie Adams and her boyfriend Charles Cummings were in their room at the Right Step Motel. They were watching television when they heard a knock on the door. Cummings remained sitting on the bed while Adams answered the knock. When she opened the door, defendant Gonzalez was standing there. Adams asked him, "Who are you looking for?" Gonzalez pulled back a blanket he was holding to reveal a shotgun. He "cocked"[2] the weapon, making a "clack-clack" sound, and pointed it at Adams's chest from two or three feet away. Adams testified she was familiar with guns and recognized it as a shotgun.

Cummings testified he recognized the sound of Gonzalez's weapon as the noise a shotgun makes when "[y]ou're ejecting it, getting ready to fire." He looked over and saw Gonzalez pointing a shotgun at Adams. Cummings said, "What the hell is going on?", and Gonzalez responded by walking down the hall. Adams immediately slammed the door shut. Shortly thereafter, she and Cummings heard screaming coming from down the hall. Cummings testified he was familiar with shotguns because "I was raised up in the country and we went hunting with shotguns."

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     Adams demonstrated this, making an arm motion toward her body: "Let the record reflect she took her right hand with the palm up and moved it back toward her body."

2

That same night, Christian Jones and his girlfriend Debra Ooten were also in a room at the Right Step Motel, where they had been living for a month or two. At about 1:40 a.m., they were in bed; Ooten was sleeping and Jones was just falling asleep. Jones heard an "odd knock" at the bottom of the door; it sounded as if someone had "knocked on [the door] with an object." As Jones opened the door, it was "pushed in on [him]" and he found himself staring at the barrel of a rifle pointed at his face from just a few inches away. Jones described the rifle, which was partially covered by a blanket, as an "M-14-type looking rifle." Gonzalez waved the barrel of the gun in Jones's face. Ooten woke up and began screaming, at which point Gonzalez pointed the rifle at her from about five feet away. Jones and Gonzalez were yelling at each other. Jones testified he was "[y]elling in fear of my life. And hers." Somebody came in, grabbed Gonzalez and escorted him from the room. Before he left, Gonzalez kicked Jones in the groin. Jones testified he did not know Gonzalez and had never even seen him before. Ooten testified she had seen Gonzalez around the motel but never talked to him.

Videotape from the motel's surveillance cameras showed Gonzalez entering and later leaving through the front door of the motel. In still photographs, taken from this videotape, Detective John Hayes testified he could see Gonzalez walk into the motel while holding what "[a]ppears to be the butt of a shotgun." Then, as Gonzalez left the motel, "he takes his right hand and puts it behind his back . . . to keep the weapon out of view from the cameras." Hayes also testified a pump shotgun "can . . . be cycled [even] if there are no bullets in it."

When Gonzalez was subsequently arrested, he had neither a gun nor any ammunition on him. And when police searched his residence, they did not find a gun or any ammunition. Gonzalez told Hayes: "I have been known to lose my head and do some crazy things. I get pumped up and lose my mind. I don't work for nobody. Nobody can make me do nothing. I don't even know how I would get a rifle."

Angela Marquez testified that when she saw Gonzalez at the Right Step Motel about 1:30 a.m. on July 12, 2012, he was a little drunk. She saw him arguing loudly with Jones, but she did not see him with a gun. Marquez had known Gonzalez for 15 years. She also knew Jones and she testified Gonzalez and Jones were friends. Marquez identified herself as the person shown in the surveillance videotape escorting Gonzalez away from the room occupied by Jones and Ooten. Marquez acknowledged she had suffered prior convictions for petty theft, corporal injury on a spouse or cohabitant, and taking a vehicle without the owner's consent.

2. *Defense case.*

Silhouette Flores testified she had been socializing with friends at the Right Step Motel on July 12, 2012. Hearing an argument, she peeked her head outside the motel room and saw Gonzalez, whom she identified as "[m]y friend right there." Flores saw Gonzalez leaving and she also saw Marquez. Flores testified she did not see Gonzalez carrying a gun.

3. *Trial proceedings.*

Gonzalez had been charged with four counts of assault with a firearm, one for each of the four occupants of the two motel rooms. However, at the close of the prosecution case, the trial court granted Gonzalez's motion to dismiss the charge involving Cummings for insufficient evidence. The jury convicted Gonzalez on each of the three remaining counts.

## CONTENTIONS

1. There was insufficient evidence to sustain Gonzalez's convictions for assault with a firearm.

2. The trial court misinstructed the jury on the elements of assault with a firearm.

3. The trial court erred by requiring a defense witness to testify while handcuffed.

4. The trial court miscalculated Gonzalez's presentence custody credits.

**DISCUSSION**

1. *Sufficient evidence of assault with a firearm.*

Gonzalez contends there was insufficient evidence to support his conviction for three counts of assault with a firearm. This claim is meritless.

    a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th

5

1567, 1573.) As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id*. at p. 12, italics added.)

Section 240 provides: "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." As our Supreme Court explained long ago: "Holding up a fist in a menacing manner, drawing a sword or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault. So, any other similar act, accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of using actual violence against the person of another, will be considered an assault." (*People v. McMakin* (1857) 8 Cal. 547, 548.)

"[T]he crime of assault has always focused on the nature of the act and not on the perpetrator's specific intent. An assault occurs whenever ' "[t]he next movement would, *at least to all appearance*, complete the battery." ' [Citation.] Thus, assault 'lies on a definitional . . . *continuum of conduct* that describes its essential relation to battery: An assault is an incipient or inchoate battery; a battery is a consummated assault.' [Citation.] As a result, a specific intent to injure is not an element of assault because the assaultive act, by its nature, subsumes such an intent." (*People v. Williams* (2001) 26 Cal.4th 779, 786.)

"To point a loaded gun in a threatening manner at another . . . constitutes an assault, because one who does so has the present ability to inflict a violent injury on the other and the act by its nature will probably and directly result in such injury. [Citations.]" (*People v. Miceli* (2002) 104 Cal.App.4th 256, 269.) In *People v. Hartsch* (2010) 49 Cal.4th 472, the victim "testified that on the night in question she heard

6

something ram the front door of her apartment. When she opened the door, she saw a truck not far from the door, and a person seated on the passenger side pointing a gun at her. She slammed the door and called the police." (*Id*. at p. 507.) *Hartsch* concluded there had been an assault with a deadly weapon: "[D]efendant argues there was no showing he knew that his actions . . . would probably and directly result in a battery. However, he concedes that *pointing a gun at someone in a menacing manner is sufficient to establish the requisite mental state*. [Citations.]" (*Id*. at pp. 507-508, italics added.)[3]

On the other hand, "[a] long line of California decisions holds that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person. [Citations.]" (*People v. Rodriguez, supra,* 20 Cal.4th at p. 11, fn. 3.) "The threat to shoot with an unloaded gun is not an assault, since the defendant lacks the present ability to commit violent injury." (*People v. Fain* (1983) 34 Cal.3d 350, 357, fn. 6.) However, "[a] defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon." (*People v. Rodriguez, supra,* at p. 13.) "The drawing of a weapon is generally evidence of an intention to use it. Though the drawing itself is evidence of the intent, yet that evidence may be rebutted when the act is accompanied with a declaration, or circumstances, showing no intention to use it. But when the party draws the weapon, although he does not directly point it at the other, but holds it in such a position as enables him to use it before the other party could defend himself, at the same time declaring his determination to use it against the other, the jury are fully warranted in finding that such was his intention." (*People v. McMakin, supra,* 8 Cal. at p. 549.)

---

[3]     *Hartsch* was a death penalty case. The question whether there was sufficient evidence to sustain a prior conviction for assault with a deadly weapon arose during the penalty phase when the defendant objected to this offense being used as an aggravating factor under section 190.3.

2. *Discussion.*

Gonzalez claims his aggravated assault convictions must be overturned because there was no evidence his shotgun was loaded. We disagree.

Gonzalez argues he did nothing more than stand in front of two motel rooms and very briefly point his shotgun at the occupants.[4] He acknowledges having "racked" or cocked the gun while pointing it at Adams, but he notes Officer Hayes testified a shotgun could be racked without being loaded. He asserts: "Without more, this . . . could have been enough for the jury to find he had assaulted [the victims]. However, the circumstances indicate that was not his intention. Immediately after cocking the gun, he said he was in the wrong room and left. . . , so the natural and probable consequences of his pointing his gun at the victims would not have been to fire on them. Then, when appellant pointed the gun at the second pair of victims, he had words with the victim who answered the door, and then left with his friend, [Marquez]. Consequently, when appellant pointed the gun at these victims, the evidence indicates that once again, the natural and probable consequences of his actions would not have been to commit a battery."[5]

But Gonzalez is ignoring the substantial circumstantial evidence showing his gun was indeed loaded. He pointed it directly at each of the three victims from extremely close range. He "racked" the gun in the presence of Adams, further indicating he was prepared to shoot. The mere fact it is possible to rack an unloaded shotgun does not by itself demonstrate Gonzalez's gun was unloaded. Contrary to his argument, nobody

---

[4]    Gonzalez also argues he had no apparent motive for assaulting the victims. However, "a prosecutor ordinarily need not prove motive as an element of a crime [citations], [although] the absence of apparent motive may make proof of the essential elements less persuasive [citation]." (*People v. Phillips* (1981) 122 Cal.App.3d 69, 84.)

[5]    Gonzalez correctly points out there was no evidence in the record suggesting he intended to use the shotgun as a club for hitting someone, an alternative way of committing assault with a firearm.

8

testified Gonzalez *said* he was in the wrong room.[6] As the Attorney General points out, the fact Gonzalez was in each motel room only briefly before walking away does not help him: "[I]n advancing this argument, appellant conveniently ignores the circumstances under which he walked away from the victims. With regard to . . . Adams, he only left the room after Cummings yelled, 'What the hell is going on?' And the brevity of appellant's encounter with Jones and Ooten cannot be attributed to appellant, as he did not voluntarily leave. He was escorted away by friends, and did not leave before kicking Jones in the groin."

During closing argument, the prosecutor told the jury the very fact Gonzalez had been knocking on motel doors in the middle of the night and pointing his shotgun at the occupants tended to demonstrate the gun was loaded: "[T]hink about it, he's coming in at night, [1:30] in the morning . . . and he walks in, he's got [the shotgun], he's hiding it." "[C]an be a squirt gun, you know, can be a toy, 'Just kidding. You're a knuckle head. This is fun.'. . . 'I'm not a bad guy. I don't carry loaded guns. I'm just cruising around hoping somebody shoots me.' [¶] When you have your residence at night entered and you open the door and you have someone that points a gun right at your chest . . . . I mean, it's preposterous to think it's not loaded." "[W]hen someone is in their own home, there is law that you could kill him, you could defend your own home and . . . blow him away. It's your home." The prosecutor was making a good point: unless Gonzalez had a death wish, it was fair to infer his gun was loaded in light of the danger to Gonzalez himself inherent in what he was doing.

We conclude there was sufficient evidence to prove Gonzalez had the present ability to commit a battery with the shotgun.

---

[6] Nor do we think it would make any difference to the outcome had Gonzalez actually said this.

2. *Trial court did not misinstruct on the elements of assault with a firearm.*

Gonzalez contends he was not properly convicted of assault with a firearm because the jury was not instructed to find he had the specific intent to assault the victims. This claim is meritless. As Gonzalez himself acknowledges, our Supreme Court has held that assault is a general intent crime. "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams, supra,* 26 Cal.4th at p. 790.)

3. *Restraining defense witness did not constitute prejudicial error.*

Gonzalez contends his convictions must be reversed because the trial court impermissibly required the sole defense witness to appear before the jury in handcuffs. Although we agree the trial court erred by not explaining why the handcuffs were necessary, we conclude the error was harmless.

a. *Background.*

Silhouette Flores, the only defense witness, appeared at a pretrial hearing and was ordered to return to court on March 20, 2013. She did not appear on that date and the trial court issued a bench warrant. On April 12, 2013, when Flores again failed to appear, the court issued a $50,000 body attachment. On May 13, 2013, Flores finally appeared in court after having been arrested on an unrelated charge.

Defense counsel asked the trial court to exclude "the fact that [Flores], who has defaulted, decided not to show up at court and is testifying in custody, as more prejudicial than . . . probative." The court, apparently responding to the prosecutor's earlier argument that evidence of Flores's failure to appear went to her credibility, denied defense counsel's request: "That motion is denied. [¶] She was told any number of times to come back and she's delayed the case as well."

10

During defense counsel's direct-examination of Flores, the following colloquy occurred:

"Q. Now, I'm sure the jurors notice that you came here in handcuffs. Yes?

"A. Yes.

"Q. Is that because even though the judge ordered you to come back to court, you didn't come back to court?

"A. Yes.

"Q. Did the judge tell you you were going to be a witness?

"A. Ah, yes.

"Q. Why didn't you come back to court?

"A. Because I try to mind my own business and I try not to be in anybody's business and I just didn't want to be a witness for anybody, for anything."

      b. *Legal principles.*

"[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291, fn. omitted.) "The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Id*. at p. 291.) "The rules articulated hereinafter are applicable to the shackling of defendants *and defense witnesses*, since the considerations supporting use of physical restraints are similar in each instance. [Citation.] . . . [H]owever, the prejudicial effect of shackling defense witnesses is less consequential since 'the shackled witness . . . [does] not directly affect the presumption of innocence.' [Citation.]" (*Id*. at p. 288, fn. 4.)

      c. *Discussion.*

Gonzalez contends "the trial court in this case gave no justification that could conceivably be considered valid for requiring Ms. Flores to appear in handcuffs, in full unfettered view of the jury, without taking any steps to hide them from the jury's view.

11

Apparently, its only reason was to embarrass her because she had failed to obey the court's orders and was a defaulting witness."[7]

Initially, the Attorney General asserts the trial record does not contain any factual basis for this claim because "[t]he clerk's transcript contains no notation that Flores was handcuffed, and neither the prosecutor nor defense counsel raised the issue of restraints with the trial court. Admittedly, Flores responded affirmatively when defense counsel asked whether she thought that the jurors noticed that she 'came in here in handcuffs.' But this single, isolated question that improperly asked Flores to speculate based on facts that were not in evidence, created an ambiguous record rather than one affirmatively showing error." We disagree. Defense counsel's question implicitly asked Flores if she had come into the courtroom in handcuffs and she answered yes. Moreover, had Flores not actually been handcuffed we cannot imagine the prosecutor sitting silent while defense counsel asked Flores about handcuffs.

The Attorney General also argues Gonzalez has waived this claim by raising it here for the first time.[8] (See *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 ["It is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal. Defendant's failure to object and make a record below waives the claim here."].) Nevertheless, in the interests of judicial economy and to avert potential ineffective assistance of counsel claims, we will address the merits of this issue. (See *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310.)

---

[7] Gonzalez also argues the trial court erred by not, sua sponte, instructing the jury with CALCRIM No. 337 (Witness in Custody or Physically Restrained), which would have admonished the jury to disregard a witness's physical restraints. We need not reach this argument, however, since we conclude the trial court erred by making Flores testify while wearing handcuffs without any showing of a manifest necessity to do so.

[8] Gonzalez argues defense counsel's reference to Flores "testifying in custody" constituted an objection to the handcuffs. However, we are more inclined to read this phrase as a reference to a witness taking the stand while wearing jail clothing, rather than a reference to shackling or other physical restraints.

12

The Attorney General does not attempt to defend the trial court's decision to handcuff Flores, arguing instead that any error was harmless. We agree. As explained by *People v. Ceniceros* (1994) 26 Cal.App.4th 266, 280, the proper standard of review is *Watson*'s[9] "reasonable probability of a more favorable result in the absence of the error" test: "[I]mproper restraint of a witness does not affect the defendant's decision to take the stand, impede his ability to confer with counsel or otherwise significantly affect trial strategy. For these reasons, we conclude the erroneous shackling of a defense witness under the circumstances presented here does not result in the deprivation of a specific federal constitutional right or so impair the trial process that it resulted in a deprivation of due process. Therefore, the effect of this error must be evaluated under the *Watson* standard." (*People v. Ceniceros, supra,* at p. 280.)

Flores testified she heard the screaming coming from Jones and Ooten's room, peeked her head into the hallway, and saw Gonzalez *not* carrying a gun. However, not only was Flores's testimony cumulative of Marquez's testimony on the same point, but Flores's credibility was seriously undermined by various factors. She testified she was on drugs at the time and that she does not have good eyesight:

"Q. Okay. What did you see [Gonzalez] carrying when you saw him leaving?

"A. *I didn't see him carrying anything but I can't see far, I need glasses.*" (Italics added.) Flores acknowledged she had prior convictions for possession of burglary tools and taking a vehicle without the owner's consent. Moreover, as Gonzalez concedes, both Marquez and Flores were friends of his.

Gonzalez argues that, given the contrast between his situation (charged with violent crimes yet unshackled) and Flores's situation (required to wear handcuffs), "the jury was very likely to infer that Flores presented an immediate and extraordinary threat to the safety of everyone in the courtroom. The jury would have reasonably presumed that for some reason she was an incredibly violent and dangerous person. . . . [and s]ince she was a good friend of appellant's the jury would have reasonably

---

[9]     *People v. Watson* (1956) 46 Cal.2d 818.

13

presumed that appellant had very violent tendencies as it is unusual for very violent people to associate with those who do not seek to harm anyone." But Gonzalez cites no authority for this dubious sociological observation and we find his argument unconvincing.

The evidence Gonzalez was carrying a shotgun was overwhelming. Hence, we conclude the trial court's error in requiring Flores to testify while wearing handcuffs constituted only harmless error.

4. *Gonzalez's presentence custody credits must be recalculated.*

Gonzalez contends, and the Attorney General agrees, the trial court miscalculated his presentence custody credits in two different ways. We agree with one of these claims, but not the other.

The trial court concluded Gonzalez was subject to the 15 percent presentence custody credit limitation for violent felonies contained in section 2933.1, subdivision (a). However, assault with a firearm is not one of the offenses that triggers this limitation. (See § 667.5, subd. (c).)

Gonzalez says defense counsel misinformed the trial court he had spent 296 actual days in custody because the correct number was 297 days. The Attorney General agrees with this assertion. Gonzalez suggests that, in calculating the time between his arrest on August 1, 2012, and his sentencing on May 23, 2013, defense counsel must have failed to count both the day of arrest and the day of sentencing. (See *People v. Morgain* (2009) 177 Cal.App.4th 454, 469 ["defendant is entitled to credit for the date of his arrest and the date of sentencing"]; *People v. Browning* (1991) 233 Cal.App.3d 1410, 1412 [day of sentencing counted for presentence custody credits even though it was only partial day].) Our calculation, however, shows defense counsel was right: the amount of time accrued between those two dates is indeed 296 days.

Hence, correcting for the 15 percent limitation error, Gonzalez was entitled to a total of 592 days of presentence custody credit, rather than the 340 days he was awarded.

## DISPOSITION

The judgment is affirmed as modified.  Gonzalez is entitled to an additional 252 days of presentence custody credit, for a total of 592 days of presentence custody credit. The trial court is directed to prepare and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.

15