Filed 9/26/13  P. v. Wang CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STANLEY XUESHI WANG<br><br>    Defendant and Appellant. | B239035<br><br>(Los Angeles County<br>Super. Ct. No. KA092570) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas Sortino, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Stanley Xueshi Wang, appeals his conviction for first degree murder with an enhancement for personal use of a dangerous weapon (Pen. Code, §§ 187, 12022). He was sentenced to state prison for a term of 26 years to life.

The judgment is affirmed.

**BACKGROUND**

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

Defendant Wang and the victim, Yang Yang, were married in China and subsequently moved to the United States. At the time Yang was killed, in November 2010,[1] they had a four-year-old daughter, Tiffany.

Hong Moc testified he and Yang met at church in September 2010, and became romantically involved. Yang began staying at Moc's house three or four nights a week, and then moved in with him in November. Tiffany stayed with Yang and Moc on the weekends, and with Wang during the week. On November 9 or 10, Moc accompanied Yang to consult a divorce attorney.

On November 12, Wang called 911 to report he had just returned from a one-week trip overseas to discover that his wife had taken their daughter and was refusing to tell him where she was located.[2] Deputy Sheriff Ray Huang responded to the call. Wang told Huang he had returned from a business trip to find that his wife and daughter were no longer at the apartment: "[Wang] stated that his wife took all her belongings and her daughter's belongings and possibly had moved in

---

[1]     All further date references are to the year 2010 unless otherwise specified.

[2]     On the tape of this 911 call, Wang told the operator: "[T]his is not an emergency but I have no choice but to call the police department . . . . I have a family . . . dispute this is in regarding I look for my daughter . . . my wife run out so she refuses to give me my daughter's location . . . ."

with her boyfriend." Wang said "[h]e was worried about his daughter and he felt that as a biological father, he had the right to know where his daughter was." Huang said there was nothing he could do because Wang and his wife had not yet gone to court to settle their marital dispute. He advised Wang to file the appropriate legal papers in court so he could obtain a custody order.

On November 16, at about 11:00 a.m., Moc and Yang went to Wang's apartment to drop off some shoes belonging to Tiffany. Moc waited outside while Yang went into the apartment. When Yang had not returned after 10 or 15 minutes, Moc started to worry and he tried to call and text her, but she did not answer.

About 11:35 a.m., Wang called Qiang Chen, a relative of his who was also a neighbor, and asked him to come over. When Chen arrived, Wang opened his door slightly and handed Chen a paper bag and a computer laptop bag. Chen took these bags home. Wang then called Chen again and asked him to come back. When Chen returned, Wang gave him another bag and asked him to keep it. The bags Wang gave Chen were subsequently found to contain business records, passports, Tiffany's birth certificate, social security cards for Tiffany and Yang, naturalization papers, credit cards, tax documents, and $139,000 in cash.

At 12:25 p.m., Wang called 911. He told the operator he and his wife had been arguing and hitting each other. There was a lot of blood, his wife was lying on the floor, and he wasn't sure if she was still breathing.

Wang also called his niece to say he and Yang had been arguing and they had both been injured. Wang said the police were coming and he asked his niece to pick Tiffany up from school.

When Deputy Huang responded to the 911 call he found paramedics waiting to be admitted to the apartment. Wang let them in. There was blood on his hands and all over his sleeves. He had minor scratches near his mouth and a small laceration above one eyebrow. There was blood on the hallway floor and the living room floor, as well as on the walls. Yang's body was lying on the

3

bathroom floor. A criminalist concluded Yang's head had been bleeding when she was dragged into the bathroom. In the living room Huang recovered a plastic grocery bag. This was later found to contain a rubber mallet of the kind used for auto body-work. Yang was pronounced dead by the paramedics at 12:43 p.m.

The autopsy showed Yang had sustained at least four traumatic blows to the head. Her forehead and the top of her head were black and blue. There were severe abrasions and fingernail marks on her neck. Her larynx had been fractured and she had injuries to her knees and hands. There was bruising to her hands possibly indicative of offensive wounds. Yang had been 5'2" tall and she had weighed 120 pounds; Wang was 5'10" and weighed 165 pounds. Yang's blunt force injuries were consistent with having been struck by a rubber mallet. The fingernail marks on her neck were consistent with force having been applied by a right-handed person; Wang was right handed. The evidence was consistent with Wang having strangled Yang.

The medical examiner concluded Yang had been subjected to a very severe beating, but that the actual cause of death had been strangulation. If someone had called 911 right after Yang suffered the head injuries, but before she was strangled, she would have had a reasonable chance of survival.

2. *Defense evidence.*

A preschool teacher described Wang as a loving father who had a close relationship with Tiffany. Yang's relationship with Tiffany did not seem to be as close.

The defense pathologist, Marvin Pietruszka, disagreed with the medical examiner's cause of death finding on the ground the evidence did not show there had been a completed strangulation. Rather, Pietruszka opined, Yang had suffered a ventricular tachycardia, which progressed "into a ventricular fibrillation and her heart stopped." "[S]he was afraid of something going to happen to her; serious fear, and her adrenaline raises that heart rate. It goes upwards of 170 into the 200 range. She develops an arrhythmia and dies." "Theoretically, she should be alive,

4

but I believe that she felt like she was in danger.  She was hit.  She was traumatized in many body parts.  There was a mallet that obviously was hitting her, and then on top of that, she had the hands around her neck that were cutting off her airway perhaps . . . for some period of time."

**CONTENTION**

There was insufficient evidence to convict Wang of first degree murder.

**DISCUSSION**

Wang contends the evidence was insufficient to prove he committed first degree murder.  This claim is meritless.

1. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.]  ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.  ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a

5

reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id*. at p. 12, italics added.)

The various types of premeditation and deliberation evidence have been described as follows: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [Citation.]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was

6

so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

2. *Discussion*.

Wang argues the trial evidence failed to satisfy the *Anderson* test. We disagree. In this case, there was evidence of all three *Anderson* factors: motive, planning activity, and manner of killing.

The motive for Yang's killing was obvious. The jury could have reasonably concluded Wang was upset that she had left him and started a new relationship with Moc. Indeed, just four days before the killing, Wang called 911 to complain that Yang had moved in with her boyfriend and taken Tiffany away.

There was also evidence of planning activity. On the day of the killing, Wang had in his apartment an auto-body mallet which he used to bludgeon Yang in the head repeatedly. Possession of a deadly weapon prior to a killing is evidence of planning. (See, e.g., *People v. Miranda* (1987) 44 Cal.3d 57, 87, disapproved on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907 ["that defendant brought his loaded gun into the store and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance"]; *People v. Alcala* (1984) 36 Cal.3d 604, 626, superseded by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911 ["when one . . . brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset"].)

7

In addition, the prosecutor argued to the jury the bags of documents and cash that Wang handed to Chen showed he had planned the killing because, unlike the rest of his apartment, there was no blood on these things: "Now, how do we know that he did that before he killed her? Because there's no blood inside those documents. All those pieces of paper . . . had no blood. No blood on it. If he's already hit her in the head, if he's already dragged her or done anything while she was bloody, his hands would have been bloody, just like the phone. Just like the doorknob." The prosecutor argued, "He put all those documents together ahead of time because there's no blood on them. But there's blood on the outside of the bags."

The manner of the killing also tended to show premeditation and deliberation. The medical evidence showed that Yang, although bleeding heavily, was still alive after the mallet attack, but Wang then dragged her into the bathroom where he strangled her to death. " 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) The prosecutor argued to the jury that even if they did not believe Wang planned to kill Yang before she arrived at his apartment that day, the evidence still showed premeditation and deliberation because he must have decided to strangle her after discovering she had survived the mallet attack.

There was sufficient evidence Wang committed first degree murder.

8

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:



CROSKEY, J.



KITCHING, J.

9