Filed 11/19/13  P. v. Ward CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DELANIOUS AUBRA WARD,<br><br>    Defendant and Appellant. | C070462<br><br>(Super. Ct. No. 11F00913) |

Leslie Ligons and defendant Delanious Aubra Ward began as friends, but over time their relationship deteriorated.  Defendant left numerous threatening messages on the phone Ligons shared with her longtime companion, James Dalbert.  Defendant's threats escalated and he made several trips to the couple's home.  Ultimately, defendant pulled a knife and began to tussle with Dalbert.  Dalbert and Ligons both suffered stab wounds.

An information charged defendant with making criminal threats, misdemeanor vandalism, and assault with a deadly weapon.  (Pen. Code, §§ 422, 594, subd. (a), 245,

1

subd. (a)(1).)[1]  The jury convicted defendant of all counts except misdemeanor vandalism.  Sentenced to state prison for a determinate term of 65 years plus four consecutive terms of 25 years to life, defendant argues he received ineffective assistance of counsel, sentencing error, and erroneous calculation of custody credits.  We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2011 officers responded to a 911 call reporting a stabbing involving Ligons and Dalbert.  Subsequently, an amended information charged defendant with making criminal threats (counts one & five), misdemeanor vandalism (count two), and assault with a deadly weapon (counts three & four.)  The information alleged that in conjunction with count three defendant had personally inflicted great bodily injury on the victim, Leslie Ligons, and with respect to count four had personally inflicted great bodily injury on the victim, James Dalbert, who was 70 years of age and older.  (Former § 12022.7, subds. (a), (c).)

The amended information also alleged that defendant had three prior strikes pursuant to sections 667, subdivisions (b) through (i) and 1170.12.  The prior strikes included two convictions for lewd and lascivious acts with a child and one for voluntary manslaughter.  The information alleged these convictions were serious felonies under section 667, subdivision (a).  (§§ 288, subd. (a), 192, subd. (a).)  The information also alleged two prior prison commitments pursuant to section 667.5, subdivision (b).

A jury trial followed.  The following evidence was adduced at trial.

**The Relationships**

Dalbert and Ligons, who considered themselves married, lived together in Sacramento.  Dalbert and Ligons had been a couple for approximately nine years.

---

[1]  All further references are to the Penal Code unless otherwise designated.

Ligons and defendant became friends about five years prior to trial. Over the years, their relationship deteriorated. Ligons believed defendant was obsessed with her and jealous of Dalbert.

Dalbert only knew defendant through Ligons. Ligons and Dalbert shared the same cell phone.

**The Threats Begin**

Defendant began calling Ligons and Dalbert's cell phone and leaving messages. Defendant called Ligons a bitch and said he was going to "kick [her ass]," and "he was gonna kill [Ligons] and kill Mr. Dalbert." Defendant would sometimes call back and apologize for his behavior. The calls made Ligons feel threatened and angry.

On January 31, 2011, defendant called the cell phone and said he was coming to Ligons's home to kill her "if it took a year or two years." Defendant demanded Ligons return his "stuff." Ligons did not know what he was talking about and said she was going to call the police.

When Dalbert asked defendant where he was, defendant told him to look out the window. Dalbert looked out and saw defendant coming down the street with his pit bull. Defendant stopped across the street and screamed threats that he would kill Ligons.

Ligons also saw defendant and his dog across the street from her house, "[r]anting and raving" and threatening to kill both Ligons and Dalbert. Defendant said he was going to set Ligons's house on fire and break all the windows.

Ligons called the police. The 911 call was played for the jury. Defendant left before the police arrived.

Defendant returned the following day. Ligons heard the doorbell, heard defendant threatening to kill her, and heard him banging on the security screen. After defendant

3

left, Ligons discovered the side of the security screen had been kicked in and the lock was damaged. Defendant smashed in the mailbox and slashed a window screen.[2]

**The Stabbing**

The following day defendant left more threatening messages on the cell phone. Defendant said he was on his way to their home and was going to kill Ligons. Dalbert and Ligons saw defendant walking down the street. He arrived and began ranting and raving, and calling Ligons names. Dalbert asked defendant to leave.

Ligons went outside. Defendant pulled out a knife and threw it into the grass. Ligons told him she was going to call the police.

Defendant grabbed the knife, and he and Dalbert began to struggle. Ligons saw blood and knew Dalbert had been stabbed. When Ligons attempted to intervene and protect Dalbert, defendant stabbed her in the shoulder.

Dalbert used a mop handle to knock the knife out of defendant's hand. Dalbert hit defendant in the head, and Ligons ran into the house to call 911. Ligons gave police defendant's address. Dalbert picked up the knife and brought it in the house. When officers arrived, Dalbert told them where the knife was and gave them the handle he had used to fight off defendant.[3]

Dalbert bled profusely from the cut on his cheek and was taken to the hospital by ambulance. His wound required 64 stitches, caused nerve damage and dental problems,

---

[2] Dalbert thought the incident occurred prior to the incident with the pit bull.

[3] Dalbert's recollection of events differed from Ligons's in some of the details. Defendant approached the house and Ligons went out to talk to him. Dalbert saw defendant swing at Ligons, who screamed that she had been cut. Dalbert, who is in his midseventies, picked up the mop handle that he had placed by the door for protection. Defendant swung at Dalbert and stabbed him in the face, cutting his cheek. Dalbert swung the mop handle and knocked the knife out of defendant's hand. Defendant kept coming, so Dalbert hit him again. He hit defendant in the head because defendant kept coming at him, trying to get the knife.

4

and impacted his speech.  Ligons also went to the hospital, where her shoulder was stitched up.[4]

**Defendant's Arrest**

When an officer arrived, he found a blood trail from the street, up the driveway, to the kitchen.  Blood "trailed off down the sidewalk" as well.  The officer encountered the wounded Dalbert and Ligons, requested medical aid, and questioned the pair.  They identified the knife.

Another officer saw defendant walking nearby and thought he might be involved in the incident.  Defendant appeared to have blood on his shirt, face, and hands.  Defendant told the officer that Dalbert and Ligons had beaten him up.  An ambulance took defendant to the hospital.

At the hospital, after being advised of his *Miranda* rights,[5] defendant told officers that Ligons had been at his house on January 31, 2011, and had stolen his hair clippers, worth $50 or $60.  He went to Ligons's house to get his money back.

When defendant arrived at Ligons's house, Ligons and Dalbert came out and asked him to get rid of his knife.  Defendant took his knife out of his pocket and threw it onto the grass.  After defendant gave up his knife, Ligons and Dalbert beat him with a wooden cane.  The only provocation was defendant's request for reimbursement.

According to defendant, he never retrieved the knife or stabbed anyone.  He had no idea how Ligons and Dalbert were injured.  He left when the pair told him they were calling the police.

---

[4] During cross-examination, Ligons admitted a misdemeanor check fraud conviction in 2003.

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

**Defendant in the Hospital**

A hospital emergency room nurse testified that after his admission, defendant was belligerent, cursing, angry, and making inappropriate comments. Defendant made threats and said, "I'm gonna go back and kill that mother fucker." An officer at defendant's bedside also heard defendant make the statement; defendant was agitated and angry.

Another nurse who treated defendant described him as combative, yelling and cursing at the staff. The staff treated defendant for a cut on his forehead and put on a neck brace. Defendant tried to remove the brace and get off of the gurney. Although he was handcuffed to the bed, it took additional medical staff to restrain him.

**Additional Evidence**

Kenneth Rapier knew defendant. He last saw defendant prior to the stabbing incident, when defendant came to his house to show him his dog. Defendant appeared to have been drinking but did not seem intoxicated. Rapier later saw defendant walking his dog. As Rapier drove by, defendant shouted out, asking where "the girl" lived. Defendant also called the woman he was asking about a derogatory name.

Rapier told a district attorney's investigator that defendant appeared to be "high." Defendant told Rapier his shaver was missing and he believed Ligons had taken it. Rapier also testified that Ligons said she and defendant had an intimate relationship. He had seen Ligons at defendant's home on several occasions.

**Defense Case**

A detective spoke with Ligons on March 1, 2011. Ligons told the detective she had received unwanted phone calls from defendant at some point in the past, prompting her and Dalbert to relocate.

On February 1, 2011, defendant came to her home and pounded on the door, but she did not see him actually damage the mailbox or the door. As for the stabbing incident, Ligons stated she had received a threatening phone call from defendant and saw him walking down the street with a knife. Defendant and Dalbert struggled, and Ligons

hit defendant with a cane. Defendant stabbed her in the shoulder. Dalbert hit defendant with a metal object, and defendant stabbed Dalbert in the face.

During cross-examination, the detective testified Ligons appeared confused about the sequence of events. The detective's report described Ligons as unclear as to the exact order of events.

Lynn Richards, a neighbor of defendant, identified photographs of Ligons that showed Ligons in defendant's bedroom. Ligons told Richards that defendant was her lover; Richards had seen Ligons enter defendant's home at night. Ligons also said she told Dalbert she was not seeing defendant even though she was.

During cross-examination, Richards stated that on the day of the stabbing she spoke with defendant and he appeared to have been drinking. Defendant was angry because his hair clippers were missing and he believed Ligons was the thief.

Julie Scott, who knows both Ligons and defendant, testified Ligons told her that she and defendant had a romantic relationship. Ligons said the relationship had endured for four years. Scott also testified Dalbert knew about the relationship, and she saw Dalbert and Ligons argue about it. Scott had been previously convicted of child cruelty, assault with a deadly weapon, and theft.

**Verdict and Sentencing**

The jury found defendant guilty on all counts except count two, misdemeanor vandalism. With respect to count three, the jury found defendant had not inflicted great bodily injury on Ligons, but with respect to count four found that defendant had inflicted great bodily injury on Dalbert. The court found defendant had suffered three prior strikes.

The court sentenced defendant as follows: count one, making criminal threats, 25 years to life; count three, assault with a deadly weapon, 25 years to life; count four, assault with a deadly weapon, 25 years to life; and count five, making criminal threats, 25 years to life. In addition, the court sentenced defendant to an additional five years

7

under former section 12022.7, subdivision (c). The sentences are to be served consecutively.

The court also sentenced defendant to an additional five years for each of his three prior convictions and ordered the enhancements to be imposed individually as to each of the three strikes counts. The court did not impose sentence for the two prior prison term commitments. Defendant's total sentence is a determinate prison term of 65 years and four consecutive indeterminate terms of 25 years to life. Defendant filed a timely notice of appeal.

## DISCUSSION

### Ineffective Assistance of Counsel

Defendant argues counsel performed ineffectively in failing to object under Evidence Code sections 352 and 1101 to the admission of the threat he made in the hospital, " 'I'll go back and kill that motherfucker.' " Defendant also faults defense counsel for failing to request a limiting instruction once the statement was admitted.

*Background*

Prior to trial, defense counsel asked that some of defendant's statements in the hospital be excluded. The trial court agreed to exclude several statements.

Defense counsel argued defendant's statement, " 'I'll go back and kill that motherfucker,' " was irrelevant. Defense counsel reasoned: "Now, we have to remember what's happened at this point. He's in -- there is some sort of altercation between my client and the two complaining witnesses here. My client has this -- was struck very hard on the head. In fact, I think the court might be able to see that he still has that scar on his head from the blow that he received. [¶] If he at that point is angry and says, 'I'll go back and kill that motherfucker,' that is a statement, if said and if believed, expressing his feeling 30 minutes after the event. The fact that he might be angry and might wish them ill is not relevant to what his state of mind was at the time of the event."

8

The prosecution responded: "Well, I believe that might be his argument for the jury. It's highly relevant to his state of mind at the time of the event; I mean, especially when you have a [section] 422 charge and a specific element that must be proven is the defendant's intent that the statement be taken as a threat. [¶] The jury is being asked to get into his mind, and what better way to get into his mind than to hear and see what he is doing in the time surrounding the event in the moments before and the moments after." The trial court ruled: "I find that that statement is relevant, and it is admissible."

During trial, the prosecution asked the court to revisit its ruling on the other statements defendant made at the hospital. The court again found the evidence inadmissible under Evidence Code section 352.

*Discussion*

To establish ineffective assistance of counsel, a defendant must show counsel's performance was deficient and fell below an objective standard of reasonableness, and it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674].) A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

In addition, we review a trial court's decision on the admissibility of evidence under the abuse of discretion standard. We reverse only if the court acted in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

According to defendant, defense counsel's failure to object under Evidence Code sections 352 and 1101, and failure to request a limiting instruction once the trial court admitted his hospital statement, deprived defendant of the effective assistance of counsel, thereby violating his rights under the Sixth Amendment to the United States Constitution. Defendant further argues there could be no reasonable tactical basis for defense counsel's failure to object, and defendant was prejudiced by the admission of the hospital threat.

9

Any objection by defense counsel based on Evidence Code section 352 would have been futile. Defense counsel objected on grounds of relevance, and the trial court rejected the challenge.

Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time. Even though the record must show the trial court weighed prejudice against probative value, we may infer the necessary showing from the record in the absence of an express statement by the trial court. (*People v. Prince* (2007) 40 Cal.4th 1179, 1237.)

Defendant was charged with making criminal threats against Ligons, and with assaulting Ligons and Dalbert with a knife. Defendant told police he was attacked by Ligons and Dalbert and that he had abandoned his knife in the grass. Defendant's comments to the nurse at the hospital, a continuation of his threats against Ligons, were probative of his state of mind. Nor was the statement more inflammatory than his threats made prior to the stabbing. The trial court did not abuse its discretion in finding the statement admissible under Evidence Code section 352.

Defendant also argues defense counsel should have objected under Evidence Code section 1101, subdivision (b). According to defendant, the "evidence did not logically tend to prove the 'intent' as to the charged threats, was not offered on a material issue in the case, and was overwhelmingly cumulative on the issue of [defendant's] threats and intent." However, nothing in the record supports defendant's contention that the threat defendant uttered to the nurse was admitted under section 1101, subdivision (b), evidence of prior uncharged acts. The court admitted the statement purely on relevance grounds. Therefore, any objection under section 1101 would also have been futile.

## Consecutive Sentences

Defendant challenges the court's decision to sentence him to consecutive sentences, contending the court erred in "failing to understand that the

10

concurrent/consecutive determination is governed by the pertinent Three Strikes law provisions." As a consequence, defendant requests the matter be remanded for resentencing.

*Background*

At sentencing the trial court provided a lengthy explanation of its sentencing decisions. The court reviewed defendant's extensive criminal record and declined to exercise its discretion and strike a prior conviction.

The court found numerous circumstances in aggravation. The crime involved great violence, great bodily harm, and other acts disclosing a high degree of callousness. The crime indicated planning: defendant went to Ligons's house armed with a knife. Defendant's conduct indicates he is a serious danger to society. Defendant has prior convictions of increasing seriousness. Finally, defendant's prior performance on parole was unsatisfactory. (California Rules of Court, rule 4.421(a)(1), (8) & (b)(1), (2), (5).)

The court then sentenced defendant to 25 years to life on counts one, three, four, and five. The sentences are to run consecutively "in that each of the crimes and their objectives were predominantly independent of each other, pursuant to Rule of Court 4.425(a)(1)."

*Discussion*

Defendant contends the trial court did not understand its discretion under the three strikes law to impose concurrent rather than consecutive sentences. However, stripped to its essence, defendant's argument is that the offenses were committed on the same occasion or arose from the same set of operative facts. Therefore, consecutive sentences were not warranted and resentencing is required.

Under the three strikes law, section 667, subdivision (c)(6) and (7) provides: "(6) If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e). [¶]

11

(7)  If there is a current conviction for more than one serious or violent felony as described in paragraph (6), the court shall impose the sentence for each conviction consecutive to the sentence for any other conviction for which the defendant may be consecutively sentenced in the manner prescribed by law."

Section 667, subdivision (c)(6) mandates consecutive sentences for any current felony convictions " 'not committed on the same occasion, and not arising from the same set of operative facts.' " (*People v. Lawrence* (2000) 24 Cal.4th 219, 222-223 (*Lawrence*).)  Conversely, consecutive sentences are not mandatory if the current felony convictions are committed on the same occasion or arise from the same set of operative facts.  (*People v. Deloza* (1998) 18 Cal.4th 585, 591 (*Deloza*).)

The Supreme Court found that "same occasion" refers to a close temporal and spatial proximity between the acts underlying the convictions.  (*Deloza, supra,* 18 Cal.4th at p. 594.)

In *Deloza* the defendant committed four robberies simultaneously in a furniture store.  One victim approached the defendant as he was robbing the other three.  The court concluded defendant's "criminal activity was not thereby interrupted, but merely continued with her as an additional victim." (*Deloza, supra,* 18 Cal.4th at p. 596.)  Therefore, the offenses occurred on the same occasion within the meaning of the three strikes law and consecutive sentences were not mandatory.  (*Id.* at pp. 596, 600.)

The court reached the opposite conclusion in *Lawrence*, *supra*, 24 Cal.4th 219.  In *Lawrence* the defendant stole alcohol from a store, ran away, and jumped a nearby fence.  The homeowner chased and tackled the defendant.  The two men fought until the homeowner's girlfriend approached them with a baseball bat.  The defendant struck the girlfriend in the head with the bottle.  (*Id.* at pp. 223-224.)

The *Lawrence* court applied the close spatial and temporal proximity test and concluded the aggravated assault against the girlfriend that took place two to three minutes after the theft from the market at a spot one to three blocks away was not

12

committed on the same occasion as the theft within the meaning of section 667, subdivision (c)(6). (*Lawrence*, *supra*, 24 Cal.4th at p. 229.) In addition, the court set forth several factors to consider in applying the test: "[T]he nature and elements of the current charged offenses—for example, the extent to which common acts and elements of such offenses unfold together or overlap, and the extent to which the elements of one offense have been satisfied, rendering that offense completed in the eyes of the law before the commission of further criminal acts constituting additional and separately chargeable crimes." (*Id.* at p. 233.)

Defendant faults the trial court for not clearly articulating its authority under the three strikes law to impose consecutive sentences. However, we presume the trial court was aware of and followed the applicable law in imposing sentence. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) In order to overcome this presumption, defendant must affirmatively demonstrate error. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) Defendant cannot meet this burden.

There is no reason to suspect the trial court was unaware of its authority, as we have discussed, or its discretion to determine whether sentences are to run concurrently or consecutively. In the absence of a clear showing of abuse, we may not disturb the court's exercise of its discretion. The court abuses its discretion when, after considering all the circumstances, its sentencing decision exceeds the bounds of reason. (*People v. Bradford* (1976) 17 Cal.3d 8, 20.) We presume the court considered the relevant criteria in the California Rules of Court in deciding whether to impose consecutive or concurrent sentences. (California Rules of Court, rule 4.425.)

The trial court listed numerous factors in aggravation and specifically cited the appropriate California Rules of Court on which it based its decision to sentence defendant consecutively. With respect to counts one and five, the court noted the crimes were predominately independent of one another. The two counts of criminal threats were committed on different days. Counts three and four, the assaults on Ligons and Dalbert,

13

were committed against two different victims.  The court's listing of aggravating factors, along with defendant's criminal history and the recommendation of the probation department, all support the court's decision to impose consecutive sentences.  We find no error.[6]

## Section 654

Defendant asserts that section 654 prohibits multiple punishment for counts one, three, and five, and the five year former section 12022.7, subdivision (c) personal infliction of great bodily injury enhancement attached to count four.  Accordingly, defendant argues the punishment for two of the counts and the enhancement should be stayed.

### Background

Defendant had a prior conviction for voluntary manslaughter (§ 192, subd. (a)) and two prior convictions for lewd and lascivious acts with a child (§ 288, subd. (a)).  The court sentenced defendant on count one, making criminal threats, to 25 years to life; on count three, assault with a deadly weapon, to 25 years to life; and on count five, making criminal threats, to 25 years to life.  In connection with count four, assault with a deadly weapon, the court sentenced defendant to 25 years to life and an additional five years under former section 12022.7, subdivision (c).  All sentences are to be served consecutively.

### Discussion

Section 654, subdivision (a) provides, in part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case

---

[6] Since we find the trial court did not abuse its discretion in imposing consecutive sentences, we need not address defendant's claim that counsel performed ineffectively in failing to object at sentencing.

shall the act or omission be punished under more than one provision." Under section 654, if the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one. Conversely, if the evidence reveals the defendant entertained multiple criminal objectives independent of one another, the court may impose punishment for independent violations committed in pursuit of each objective even if the violations shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

Here, defendant committed four discrete, independent acts. In count one, defendant made criminal threats on January 31, 2011, against Ligons. In count five, defendant made criminal threats on February 2, 2011, against Ligons. Count three refers to defendant's stabbing Ligons, and count four refers to defendant's attack on Dalbert, both of which also occurred on February 2, 2011.

Defendant argues counts one, three, and five "constitute an indivisible course of conduct pursuant to one objective -- [defendant] was angry because he believed Leslie stole property from him." We disagree.

Count one occurred on a different day than the other three counts. On January 31, 2011, defendant called Ligons and threatened to kill her. On February 2, 2011, defendant called Ligons and told her he was on the way to her house and was going to kill her. Defendant arrived at the house and stabbed both Ligons and Dalbert. Although two of the counts involved criminal threats by defendant against Ligons, they occurred on different days. In the first, defendant demanded his property back and threatened Ligons. In the second, defendant announced his intent to come to Ligons's house and harm her. Section 654 does not bar punishments for counts one, three, four, and five.

Defendant also contends section 654 bars punishment for both count four, assault with a deadly weapon against Dalbert, and the former section 12022.7, subdivision (c) enhancement for inflicting great bodily injury on the victim, who was 70 years of age or older. Defendant asserts both were based upon the very same act, and defendant had

15

already been punished for count four.  Since section 654 applies to enhancements, his five-year sentence for the enhancement must be stricken.

The interplay of section 654 with enhancements was explored by the Supreme Court in *People v. Ahmed* (2011) 53 Cal.4th 156 (*Ahmed*).  The court determined courts "should first examine the specific sentencing statutes.  If, as is often the case, these statutes provide the answer, the court should apply that answer and stop there.  Because specific statutes prevail over general statutes, consideration of the more general section 654 will be unnecessary." (*Ahmed*, at p. 159.)  Accordingly, section 654 applies to bar multiple punishment "[o]nly if the specific statutes do not provide the answer." (*Ahmed*, at pp. 159-160.)  Ultimately, the court determined that "when applied to multiple enhancements for a single crime, section 654 bars multiple punishment for the same *aspect* of a criminal act." (*Ahmed*, at p. 164.)

Here, we consider former section 12022.7, subdivision (c), which states:  "Any person who personally inflicts great bodily injury on a person who is 70 years of age or older, other than an accomplice, in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for five years."  The enhancement was found true in connection with defendant's offense of assault with a deadly weapon on Dalbert.

Former section 12022.7 is "a narrowly crafted statute intended to apply to a specific category of conduct.  It represents 'a legislative attempt to punish more severely those crimes that actually result in great bodily injury.' [Citations.]" (*People v. Chaffer* (2003) 111 Cal.App.4th 1037, 1045.)  The five-year enhancement under former section 12022.7 is imposed because of the age and vulnerability of the victim, a different aspect of the crime from the simple fact of great bodily injury.  Under the test set forth in *Ahmed*, section 654 does not bar punishment under former section 12022.7.

16

## Abuse of Discretion in Sentencing

Defendant contends the trial court abused its discretion in relying on California Rules of Court, rule 4.425(a)(1) for imposing consecutive sentences on each 25-years-to-life count. According to defendant, "on this record, the trial court's finding that each of [defendant's] crimes and objectives were independent, is irrational."

California Rules of Court, rule 4.425 lists the criteria the trial court may consider in determining whether to impose consecutive rather than concurrent sentences. Rule 4.425, subdivision (a) provides: "(1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." Rule 4.425, subdivision (b) provides, in part: "Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences."

In considering whether to impose consecutive sentences, rule 4.425 of the California Rules of Court provides criteria to guide the trial court in making the determination. In contrast, section 654 operates to bar punishment in certain cases. The statute and the rule of court do not conflict. Nor is the rule of court irrational.

Here, the court noted numerous circumstances in aggravation and also found the offenses were predominantly independent. We find no abuse of discretion. Counts one

and five involve criminal threats that occurred on different days. Counts three and four involve different victims.[7]

### Custody Credits

Finally, defendant argues the trial court erred in calculating his custody credits. According to defendant the court used the wrong date and "the abstract should be corrected to reflect: (1) 387 days of actual custody; (2) 58 days of conduct credit; and (3) a total of 445 days of credit."

At sentencing, the court awarded defendant 377 days of actual credit plus 56 days of good time/work time credit, for a total award of 433 days' credit for time served. A few months later, defendant contacted the court and requested a correction. The court issued an amended abstract of judgment and a minute order awarding defendant 387 days of actual custody credit and 58 days of conduct credit, for a total of 445 days of credit. As defendant acknowledges, the amended abstract of judgment renders his argument moot.

### DISPOSITION

The judgment is affirmed.

        RAYE        , P. J.

We concur:

        BLEASE        , J.

        BUTZ        , J.

---

[7] Since we find the court did not abuse its discretion, we need not consider defendant's claim that counsel performed ineffectively in failing to object to the court's consideration of the California Rules of Court.