Filed 4/20/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE, | B293746 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA459873) |
| v. | |
| MICHAEL ROBINSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.

Law Office of Elizabeth K. Horowitz and Elizabeth K. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Acting Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Michael C. Keller,

Acting Supervising Deputy Attorney General, for Plaintiff and Respondent.

—————————————

Michael Robinson penetrated an unconscious woman with his fingers. He challenges evidentiary rulings and requests presentence conduct credit. We affirm the evidentiary rulings but correct his presentence custody credits. All statutory references are to the Penal Code, unless otherwise specified.

I

We recount facts in light of the verdict: Robinson used a foreign object sexually to penetrate an unconscious person (§ 289, subd. (d)) and used a foreign object sexually to penetrate a person whose intoxication prevented her from resisting (§ 289, subd. (e)).

On December 16, 2014, a woman had two drinks before going to a bar with a female friend. The woman remembered drinking part of a third drink at the bar but had no memory from then until the next morning, when she woke up in Robinson's bed. She did not recognize him or know his name. Robinson said they had sex. The woman was confused and afraid. She had a boyfriend and had not wanted sex with anyone else.

The woman left Robinson's apartment and had trouble walking, thinking, and ordering an Uber. She could not remember meeting Robinson or leaving the bar. In the past, she had had up to five drinks a night but had always retained her memory. She thought she was drugged at the bar rather than simply hungover from alcohol because the symptoms, including memory loss, were alien to her.

Later that day, Robinson texted her and sent a video he took of her naked below the waist. The next day he sent her more text messages and another video.

On December 19, 2014, the woman made a police report.

Video from outside the bar and from Robinson's apartment building showed him pulling and carrying the woman into an Uber to his apartment and through his building to his door. Robinson's cell phone had a video of him using his finger to penetrate her anus, as well as photographs and videos of the woman with her eyes closed on his couch and in his bed.

Trial lasted seven days. The jury viewed video from the bar and the apartment, as well as photos and video from Robinson's cell phone.

The trial court sentenced Robinson to the middle term of six years for the offense against an unconscious person. The court stayed the sentence on the offense against a person who was too intoxicated to resist under section 654. The court awarded Robinson 52 days of actual credit plus seven days of conduct credit, for a total of 59 days.

II

The trial court properly excluded cumulative evidence about past times the woman was intoxicated at this bar. We review evidentiary rulings for abuses of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

Robinson's argument concerns his redirect examination of the bar's doorman. Robinson called this witness, who also was a manager and a bouncer at the bar. The doorman saw Robinson and the woman leave the bar and remain outside on the sidewalk, waiting for a car.

3

The doorman testified the woman seemed drunk but "she knew what was going on."

On direct examination, defense counsel asked the doorman if he thought the woman was in danger. The doorman said no: "A) they'd been outside for 15 minutes, and B) [Robinson] was making sure [the woman] wasn't falling and busting her head open and calming her, making sure she was okay and holding her up and like it's all right, Uber will be here in a couple minutes, it's okay. And like I said, I was watching them. She was completely—I'm not going to say fine, because she was intoxicated, but she was coherent. She knew what was going on even though she was still impaired."

The doorman testified he had seen the woman the "same way" on other occasions.

On cross examination, the prosecutor asked why, of the "150,000" people he has seen in his many years on the job, the doorman retained a memory of this one woman. The doorman maintained he did indeed recall this woman and this incident. One reason was Robinson and the woman "were both there quite often."

On redirect, defense counsel asked three questions that are at issue on appeal.

1) "[O]ne of the reasons you thought she was okay is that you had seen her in that condition before; correct?"

2) "[T]his was not the first time you had seen [the woman] at the . . . bar; is that correct?"

3) "Had you seen her in a similar state of intoxication before?"

The People objected to all three questions on the basis of relevance.

The court sustained the first objection without explanation in the moment, but later explained the question was improperly leading.

This ruling was correct. Leading questions generally are improper on direct or redirect examination. (Evid. Code § 767, subd. (a)(1).) A leading question is one suggesting the answer the examining party desires. (Evid. Code § 764.) The question "one of the reasons you thought she was okay is that you had seen her in that condition before; correct?" is leading. This was redirect examination. The court thus was right to sustain the objection.

This basis, which justifies the ruling, differs from the relevance ground specified in the prosecutor's objection. This difference is of no moment. The venerable rule is trial courts are not bound in their analysis to the particular ground stated in parties' objections. (See *Spottiswood v. Weir* (1889) 80 Cal. 448, 450–451.) Trial lawyers must make their objections in an instant. They commonly sense a bad question but must react speedily and sometimes fail to pinpoint the flaw precisely. We lend deference to trial court evidence rulings partly because trial judges are entitled to render a proper ruling on an objection valid in principle but flawed in expression. The judge need not pause to tutor the lawyers.

The trial judge sustained the objections to the second and third questions because the questions were cumulative. He later explained they also were more prejudicial than probative.

The second question—"this was not the first time you had seen [the woman] at the . . . bar; is that correct?"—indeed was cumulative. The doorman had testified he had seen the woman the "same way" on other occasions and Robinson and the woman

5

"were both there quite often."  The second question was redundant.  The trial judge properly rejected this question.

For the same reasons, the third question also was redundant:  "Had you seen her in a similar state of intoxication before?"

Trial judges have great discretion to curb the cumulative.  They may exclude evidence when its probative value is substantially outweighed by the probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice.  (Evid. Code § 352.)

The trial court was right to sustain objections to these questions.  The probative value of this inquiry was nil:  the evidence was already in the record.  The repeated questions about how often the victim had been drunk on other nights were wasteful of time.  Inculcating an image of the victim as a habitual drunk, moreover, was an illegitimate appeal to jury emotion.

There was no error.

### III

Robinson argues the trial court erred by allowing a drug recognition expert to testify about whether the woman was incapacitated.  This error, if error it be, was harmless.

We first identify the statements Robinson challenges on appeal.  The relevant expert testimony concerned four videos the prosecution played, one from outside the bar and three from Robinson's apartment building.  In his briefs, Robinson does not list specific statements he attacks but rather makes a global challenge to the drug expert's testimony about "whether or not [the woman] was unconscious or able to care for herself at various times."  The expert used the words "passed out" but did not describe the woman as "unconscious."  Once, after the expert

6

described her as "passed out," the prosecution asked what made the expert think she was "passed out or unconscious." We assume Robinson is challenging every time the expert testified he thought the woman was "passed out."

Regarding whether the woman could "care for herself," it was defense counsel, not the expert, who characterized the expert's testimony as being about whether the woman could "care for herself." The expert did testify about whether the woman could stand and walk unassisted, so we assume Robinson's challenge to the expert's statements about whether she could "care for herself" pertains to that testimony.

Assuming for purposes of analysis the trial court erred, it was harmless. We review errors of state evidentiary law for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (See also *People v. Jones* (2013) 57 Cal.4th 899, 957.) We ask whether it was reasonably probable the error affected the outcome of the case. (*Watson*, *supra*, at p. 836.)

It is not reasonably probable the expert's testimony affected the outcome of this case. The expert's statements were consistent with the videos, which the jurors saw for themselves. Furthermore, other evidence, including video Robinson took on his cell phone closer in time to the sexual acts, overwhelmingly supported the conviction.

We have studied the videos from outside the bar and from Robinson's apartment building. We describe the four videos and recount the challenged testimony.

The video from outside the bar shows the following. The woman lay face up with her upper body atop a newspaper stand and her legs towards the sidewalk. Robinson pulled her up; she was limp. Robinson pulled and carried her to an Uber. The

woman stood outside the car for more than a minute, during which she held onto and leaned on Robinson and the open car door. She shook her head from side to side and started to move away from the car while leaning on the door. Robinson pulled her inside the car, which took them to Robinson's apartment.

We assume Robinson challenges the following statements by the expert about this video: it "appears that she's asleep here or passed out" when the woman lay on the newspaper stand; it "appears to me that she's passed out" when Robinson moved her to the Uber; if Robinson were not holding her up, "she would probably most likely fall to the ground. She wouldn't be able to catch herself" because "she appears to be limp as he's carrying her"; she did not appear to be able to stand without holding the car door; and she "can't stand unassisted."

The jurors were entirely able to judge this video for themselves. The expert's testimony contained neither opaque models nor esoteric theories. There was no black box scientism. No quantification challenged the innumerate. Nothing about this testimony tended to overwhelm jurors' common sense and experience. Jurors regularly interpret human behavior portrayed on screens. We all do this from an early age. The expert's comments were simple and reasonable interpretations of what the video displayed. The defense was fully able to argue to the contrary. The expert's testimony could not have affected the verdict.

The three other videos were from Robinson's apartment building. We describe them chronologically. The first video shows the woman leaning on Robinson, who held and pushed her backward as he walked forward through the lobby to the elevator. Robinson walked into the elevator holding the woman's arm, but

she pulled away and leaned against the wall outside the elevator. Again, we assume (because he does not list the statements he targets) that Robinson challenges the following testimony: "it looks like she's passed out and she can't . . . walk unassisted" and "she has to use the wall for balance."

The second video from the apartment overlaps in part with the first but shows a different angle. The woman leaned against the wall outside the elevator. Robinson pulled her into the elevator and she leaned on him for the entire elevator ride. Robinson pulled the woman out of the elevator and her movement was so slow the elevator door began to close on them as they got out. The expert said "[i]t appears that she has to use a wall for balance" and "she can't stand by herself without being supported by [Robinson]." The relevant part of the third video shows the woman continuing to lean on Robinson, who pulled her down a hallway to his apartment. The expert said "it looks like she's being supported and she can't walk unassisted."

Our earlier comments apply with equal force to these videos.

It is not probable the jury would have interpreted the videos any differently if they had watched the videos without the expert's testimony. Robinson says, because the testimony came from a police expert, it "would absolutely be given substantial weight by the jury." The videos in this case do not present a close call in which the expert testimony could have swayed the jury to think differently.

Defense counsel agreed with the expert's testimony about the videos in closing argument: "And I am frank with you, yes, [the videos] show someone who look[s] like they've had a lot to drink. A lot to drink. Very unsteady. And even the drug

9

recognition expert that the People called said the same thing. He said in watching those videos it looks like she really can't take care of herself. Well, you don't need to be an expert to notice that in the videos."

Moreover, ample evidence closer in time to the sexual acts supported the conviction. Most importantly, the jury saw video of Robinson putting his finger in the woman's anus. The jury also saw other video and photos he took of her from within his apartment. The woman's eyes are closed in many of the photos and video. She had no memory of him taking them or of the events.

Assuming it was error to admit the drug recognition expert's testimony about the surveillance videos, Robinson was not prejudiced by the testimony.

IV

The trial court awarded Robinson 52 days of actual presentence custody credit plus seven days of conduct credit for a total of 59 days. Robinson says the trial court undercalculated his presentence custody credit because he was not convicted of a violent felony under section 2933.1, which would otherwise limit those credits. The People concur. We agree with both parties and direct the trial court to award Robinson 104 days of presentence custody credit and to amend the abstract of judgment accordingly.

**DISPOSITION**

We direct the trial court to award Robinson 104 days of presentence custody credit and to amend the abstract of judgment accordingly. The trial court must forward the modified abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.


WILEY, J.

We concur:


GRIMES, Acting P. J.


STRATTON, J.

11