Filed 11/2/20  P. v. Mirzakhanyan CA2/8
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B290629 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA100960) |
| v. | |
| EMIN MIRZAKHANYAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stanley Blumenfeld, Judge.  Conditionally reversed as modified and remanded with direction.

Christopher Muller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Louis W. Karlin and Kim Aarons, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

## INTRODUCTION

Defendant and appellant Emin Mirzakhanyan suffers from a psychiatric disorder that likely played a significant role in two serious disturbances that gave rise to two felony and four misdemeanor convictions. Over the course of the proceedings, Mirzakhanyan was given several opportunities to seek or participate in mental health treatment in lieu of detention and prosecution. Mirzakhanyan would not avail himself of these opportunities because he was vehemently opposed to taking psychotropic medication. He therefore proceeded to a jury trial and was convicted of two counts of felony vandalism, and one count each of misdemeanor trespass, criminal threats, battery, and battery on a peace officer. Because Mirzakhanyan would not commit to any mental health treatment programs that potentially involved medication, the court denied his request for probation.

Mirzakhanyan appealed his misdemeanor convictions for trespass and battery. He also asked us to remand his case to the sentencing court for a hearing to determine his eligibility for a newly-enacted mental health diversion program set out in Penal Code section 1001.36. Mirzakhanyan also challenged the propriety of a protective order issued against him, and alleged the court miscalculated his pre-trial conduct credit.

In our prior opinion we concluded the misdemeanor convictions for trespass and battery are supported by substantial evidence, and that a remand for mental health diversion would have been futile. We agreed with Mirzakhanyan that the protective order must be vacated and that he is entitled to an additional 12 days of conduct credit.

We affirmed the judgment, vacated the protective order, and directed the court to award Mirzakhanyan a total of 320 days conduct credit.

Mirzakhanyan then filed a petition for review arguing we should have remanded the convictions to the trial court to consider whether he was eligible for mental health diversion under the new statute. On January 29, 2020, the Supreme Court granted appellant's petition for review and deferred further consideration of the petition pending its decision in *People v. Frahs*, which was filed on June 18, 2020. (*People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*).) On August 26, 2020, the Supreme Court directed us to vacate our prior decision and to reconsider the cause in light of *Frahs*, which held the mental health diversion statute retroactive to cases pending as of the effective date of the statute. Upon reconsideration we now find substantial evidence supports the judgment of conviction; vacate the protective order; award additional conduct custody credits; and conditionally reverse the judgment of conviction and remand to the trial court to determine whether appellant is eligible for mental health diversion under Penal Code section 1001.36.

## FACTUAL BACKGROUND

### I.    The Trespass Count:  The Lexus Dealership

On April 17, 2017, Mirzakhanyan walked into a Lexus dealership and told the sales manager he was there to pick up his car. The manager, William West, recognized Mirzakhanyan because Mirzakhanyan had visited the dealership twice before. On each prior visit, Mirzakhanyan became very loud, and yelled and cursed. The most recent visit had been a few days earlier, when Mirzakhanyan was arrested by police officers after he was

3

found pacing in front of the dealership spitting on the windows. Each time, West told Mirzakhanyan he was not allowed to return.

West attempted to de-escalate the situation by asking Mirzakhanyan which salesperson he had been working with. Mirzakhanyan said he could not recall. West then asked which car he was buying, and Mirzakhanyan pointed to a Lexus LX 570 in the showroom. Mirzakhanyan demanded to speak with the dealership owner, stating, "I'm crazy. I have been off my meds for three days." Mirzakhanyan also told West he had been to the dealership before and West had "put him in jail for two months."

Mirzakhanyan became increasingly agitated and started damaging the LX 570. He attempted to pull the front grille off, kicked the body, and kicked and punched the mirrors and glass. Mirzakhanyan then got inside the car, punched through the windshield, ripped off the rearview mirror, and ripped the navigation system from the dashboard. Mirzakhanyan exited the car, kicked it again, and attempted to damage other cars in the showroom. He pulled the side mirrors off one car and punched the mirrors and glass of two others. The damage to the LX 570 alone was more than $28,000.

After damaging the cars, Mirzakhanyan stood on a water feature, started yelling, and began splashing water on people in the dealership. At one point, Mirzakhanyan said, "I will come back and shoot everyone." Police officers arrived and placed Mirzakhanyan under arrest.

4

## II.     The Battery Count:  The Altana Apartments

Five weeks later, on May 25, 2017, Mirzakhanyan went to the Altana apartment complex in Glendale.  The apartment manager, Morgan Loy, saw Mirzakhanyan pick up a six-foot-tall advertising sign in front of the complex and throw it into the middle of the street.  Mirzakhanyan started jumping on the sign and yelling while in the middle of the street.

The apartment's service manager, Mark Roe, and a service technician, Sergio Ramirez, were inside the apartment complex and saw Mirzakhanyan's outburst through the front windows.  Roe went outside and locked the entrance to the building.  After jumping on the sign, Mirzakhanyan tried to enter the building through the entrance Roe had locked.  Employees told Mirzakhanyan he could not enter the building; he nevertheless walked past Roe and tried to open the door several times.

Mirzakhanyan then turned to his left toward several three-feet high planters, grabbed some of the gravel from one of the planters with both of his hands, and threw it in Roe's direction.  At the time, Roe was standing behind Mirzakhanyan.  The gravel hit Roe's face and torso, after which Roe grabbed Mirzakhanyan and pulled him into the street.  A struggle ensued, and two other members of the maintenance team helped Roe pin Mirzakhanyan to the ground.  They kept him there as the officers arrived.

As he was being arrested, Mirzakhanyan screamed to Roe, "I'm going to kill you and your family."  He told Roe he knew where Roe worked and, "your family [is] going to die."

As Officers Insalaco and Hamilton were driving Mirzakhanyan to the Los Angeles County jail, Mirzakhanyan continuously spat on Hamilton, covering the back of his head, his uniform, and his badge with saliva.  Mirzakhanyan also covered

the outer edge of the front passenger seat and keyboard with saliva.

Mirzakhanyan caused approximately $900 worth of damage to the sign.

In or about March of 2018, approximately two months before trial, Mirzakhanyan showed up at the Altana apartment complex and confronted Roe.  Mirzakhanyan asked Roe, "Do you remember me," to which Roe replied, "Yes, I do.  You look a lot better.  Are you on medicine?"  Mirzakhanyan responded, "You're a motherfucker.  You fucking lied to the court.  You lied to everybody.  I'm going to fucking own this place.  This place Altana.  I'm going to own it."

## III.  Procedural Background

On May 15, 2017, Mirzakhanyan was charged with felony vandalism (Pen. Code, § 594, subds. (a) & (b)(1))[1], and misdemeanor trespass (§ 602, subd. (m)) based on the incident at the Lexus dealership.

On June 5, 2017, the trial court declared a doubt as to Mirzakhanyan's competence to stand trial pursuant to section 1368.  On July 11, 2017, Mirzakhanyan was declared competent.

For the incident at the Altana apartment complex, Mirzakhanyan was charged on August 7, 2017 with felony vandalism (§ 594, subd. (a) & (b)(1)), misdemeanor criminal threats (§ 422, subd. (a)), misdemeanor simple battery (§§ 242 & 243, subd. (a)), and misdemeanor battery of a peace officer (§242 & 243, subd. (b)).

---

[1]    All further references are to the Penal Code unless otherwise indicated.

6

On August 23, 2017, defense counsel declared a doubt as to appellant's competence; the court found Mirzakhanyan incompetent to stand trial and remanded him for treatment to Patton State Hospital. On January 3, 2018, Patton State Hospital certified Mirzakhanyan as competent to stand trial and on January 18, 2018, the trial court found him competent to stand trial.

On April 13, 2018, the two cases were consolidated. Mirzakhanyan was charged via amended information on May 10, 2018 with two counts of felony vandalism (§ 594, subd. (a) counts 1 and 3); misdemeanor trespass (§ 602, subd. (k); count 2); misdemeanor criminal threats (§ 422, subd. (a); count 4); misdemeanor battery (§ 242, count 5); and misdemeanor battery on a peace officer (§ 243, subd. (b); count 6). The information further alleged Mirzakhanyan committed counts 3 through 6 while released on bail.

On May 18, 2018, a jury found Mirzakhanyan guilty of all counts as charged. Mirzakhanyan admitted the truth of the bail allegation.

The court sentenced Mirzakhanyan to a total of five years in county jail, comprised of the low term of 16 months for count 1, one-third of the middle term of eight months for count 3, six months for count 4, six months for count 6, and two years for the bail enhancement. The court also imposed and stayed a six-month term for count 2 pursuant to section 654, and a 30-day term for count 5 to run concurrently to count 1. The court ordered Mirzakhanyan to serve three years of his five-year sentence. The court suspended the remaining two years of the sentence while Mirzakhanyan was placed on mandatory supervision pursuant to section 1170, subdivision (h)(5)(B).

The court also issued a three-year protective order pursuant to section 136.2, ordering Mirzakhanyan to stay away from Mark Roe, Officer Hamilton, the Lexus dealership, and the Altana apartment complex.

Mirzakhanyan timely appealed.

## DISCUSSION

Mirzakhanyan alleges on appeal that substantial evidence does not support the jury's verdicts in counts 2 and 5; he is entitled to a hearing to determine whether he is eligible for mental health diversion; the criminal protective order must be vacated; and he is entitled to 12 additional days of conduct credit.

We conclude substantial evidence supports count 2 and 5, and affirm the judgment. The protective order, however, must be vacated. Additionally, the People concede, and we agree, that Mirzakhanyan is entitled to an additional 12 days conduct credit and that he is entitled to a hearing to determine whether he is eligible for mental health diversion.

I. **The Verdicts in Counts 2 and 5 are Supported by Substantial Evidence**

*A. Standard of Review*

When a defendant challenges the sufficiency of the evidence to support a judgment, we review the evidence under the familiar and deferential substantial evidence standard. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.) Substantial evidence is evidence that is "reasonable, credible, and of solid value." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) We review the record in the light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Lee* (2011) 51 Cal.4th

620, 632.)  It is the " 'exclusive province of the trial judge or jury to determine the credibility of a witness,' " and to determine the weight to be given to the testimony adduced at trial.  (*Ibid.*; *Hicks*, at p. 429.)  Reversal under this standard of review "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

    B.    *Count 2: Trespass*

Mirzakhanyan alleges his trespass conviction must be reversed because the jury's conclusion that Mirzakhanyan intended to disrupt the Lexus dealership's business when he entered the premises was not supported by substantial evidence. We disagree.

Section 602, subdivision (k) criminalizes "[e]ntering any lands . . . for the purpose of injuring any property . . . or with the intention of interfering with, obstructing, or injuring any lawful business or occupation carried on by . . . the person in lawful possession."  The People argued Mirzakhanyan entered the Lexus dealership with the intent to damage its property or interfere with its business.  Mirzakhanyan argued to the jury that he did not intend to damage or disrupt the business when he entered; he only became agitated and disrupted when his request for a car was denied.  The jury agreed with the People and we have no reason to second guess its decision.

The evidence demonstrates that Mirzakhanyan had been to the dealership several times in the past, was escorted out by police, and was told not to return.  The most recent incident had occurred only a few days before the incident in this case.  It led to Mirzakhanyan's prior arrest, which Mirzakhanyan directly blamed on West.  The jury could reasonably conclude that

Mirzakhanyan, knowing he had been banned from the dealership and angry at West for having him arrested, returned to cause yet another disruption.

Mirzakhanyan's reliance on *In re Wallace* (1970) 3 Cal.3d 289 does not assist him. There, the defendants were arrested for handing out leaflets at a county fair protesting the effects of automation on farm workers. (*Id.* at p. 291.) A security guard told the defendants that distributing the leaflets was not permitted and asked them to leave. (*Id.* at p. 294.) They were invited to return if they left their signs and leaflets behind. (*Ibid.*) The defendants re-entered one or two hours later, resumed their leafleting activity, and refused to leave. (*Ibid.*) Our Supreme Court concluded there was no illegal trespass, largely because the defendants did not actually obstruct any activities at the fair. (*Id.* at pp. 294–295.) It was therefore evident that their only intent was to convey information, not to disrupt the activities on the premises. (*Id.* at p. 294.) *Wallace* establishes that merely returning to a business or property after being asked to leave, without more, does not necessarily prove the requisite intent necessary to support a conviction for trespass.

In *In re Ball* (1972) 23 Cal.App.3d 380, however, the defendant not only returned after being asked to leave, but then proceeded to actually obstruct business. There, the defendant entered a Disneyland parking lot and set up a table to gather signatures and donations for an anti-pollution initiative. (*Id.* at p. 385.) Disneyland had already denied the defendant permission to engage in this conduct, and suggested the defendant set up a table outside the Disneyland property. (*Ibid.*) Instead of doing so, the defendant set up his table in an area that blocked the

tram transporting passengers between the parking lot and ticket booth. (*Ibid.*) Disneyland therefore had to divert offloading of the tram to another area. (*Ibid.*) The defendant was asked several times to leave, but only complied once he was issued a citation. (*Id.* at pp. 385–386.) The Fourth District concluded the defendant's intent to obstruct business could be inferred from his conduct once he entered the lot in addition to his deliberate entry into the lot after being denied permission to do so. (*Id.* at p. 387.) *In re Ball* stands for the proposition that one can infer an intent to obstruct business when a defendant not only returns after being instructed not to, but also actually obstructs the business.

That is what happened here. Mirzakhanyan was not only told twice to leave the dealership and not return, he was also arrested and escorted from the property by law enforcement days before the incident at the dealership. When he did nonetheless return on April 17, he actually interfered with business by destroying property, yelling, and splashing water on customers. This constitutes reasonable, credible evidence from which the jury may infer Mirzakhanyan intended to cause a disruption when he entered the Lexus dealership. This is far from a case in which " 'upon no hypothesis' " is the evidence substantial enough to support the trespass conviction. (*People v. Bolin, supra,* 18 Cal.4th at p. 331.)

C.     *Count 5: Battery on Roe*

Mirzakhanyan alleges there was not substantial evidence to support the jury's conclusion that he willfully struck Roe because he was not looking in Roe's direction when he threw the gravel. We disagree.

11

The video evidence confirms that Roe was standing behind Mirzakhanyan when Mirzakhanyan threw the gravel in his direction, and that Mirzakhanyan was not looking at Roe when he threw the gravel at him. The video does not, however, establish that Mirzakhanyan did not know that Roe or any of the other maintenance workers were behind him. To the contrary, the video shows Mirzakhanyan walking directly through a group of four maintenance workers before he attempted to open the door to the apartment complex. One of the maintenance workers positioned himself directly in front of Mirzakhanyan. Immediately afterward, Mirzakhanyan walked to the planter, and Roe followed closely behind him before he threw the rocks in Roe's direction.

Additionally, Roe testified he told Mirzakhanyan not to enter the building and Mirzakhanyan walked right past him upon entering the building. Roe also testified, and the video confirms, that Roe was the person closest to Mirzakhanyan when Mirzakhanyan threw the gravel out of the planter in Roe's direction. Finally, another maintenance worker testified he and other workers were walking behind Mirzakhanyan as he approached the planter, and that Mirzakhanyan was aware of their presence.

The jury could reasonably deduce from this evidence that Mirzakhanyan knew Roe and the other maintenance workers were behind him when he threw the gravel in their direction. (*People v. Lee, supra*, 51 Cal.4th at p. 632.) Reviewing the record in the light most favorable to the judgment, we conclude there is substantial evidence from which a rational jury could find Mirzakhanyan guilty of battery. (*People v. Rodriguez, supra*, 20 Cal.4th at p. 11.)

## II. We Remand for a Mental Health Diversion Eligibility Hearing

To be granted diversion under the new statute, a defendant must satisfy six criteria. Among them are that the defendant consent to diversion and agree to comply with treatment as a condition of diversion. (§ 1001.36, subds. (b)(1)(C) & (D).) In the trial court the record was clear that Mirzakhanyan's refusal to take psychotropic medication drove a number of important decisions he had to make over the course of the proceedings. His persistent and unwavering refusal to consider medication convinced us the trial court would find him ineligible for diversion, even if the statute were applied retroactively.

However, in *Frahs*, our Supreme Court held that a "conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when . . . the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion—the defendant suffers from a qualifying mental disorder." (*Frahs*, *supra*, 9 Cal.5th at p. 640.) For those appellants whose eligibility depends on retroactive application of the statute, the court did not require a showing on any of the other six factors to obtain a remand because the record on appeal is "unlikely to include information pertaining to several eligibility factors" and requiring more would be "onerous and impractical." (*Id*. at p. 638.) Here, prior to trial, Mirzakhanyan was declared incompetent to stand trial and was sent to Patton State Hospital for treatment to restore his competence. In the course of his treatment, he was diagnosed with "Bipolar Disorder Most Recent Episode Manic Severe with Psychotic Features." It was also noted that he believed he was "Jesus Christ and 666."

13

Bipolar disorder is a qualifying mental illness. (§ 1001.36, subdivision (b)(1)(A) [specifying bipolar disorder is a qualifying mental illness].) Mirzakhanyan's diagnosis establishes his eligibility for remand. Therefore, consistent with the Supreme Court's directive, we will conditionally reverse the judgment and remand for a mental health diversion eligibility hearing pursuant to the instructions we set forth below. "We express no view regarding whether defendant will be able to show eligibility on remand or whether the trial court should exercise its discretion to grant diversion if it finds him eligible." (*Frahs, supra*, 9 Cal.5th at p. 625.)

## III.   **The Criminal Protective Order Must be Vacated**

At sentencing, the trial court entered a three-year criminal protective order pursuant to section 136.2 for Roe and Officer Hamilton, with stay-away provisions for the Lexus dealership and Altana apartment complex. Mirzakhanyan alleges the court was not authorized to issue the protective order under section 136.2 and we agree.

Orders made under section 136.2 "are 'operative only during the pendency of criminal proceedings and as prejudgment orders.' " (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1325.) The only purpose of a section 136.2 protective order is to " 'protect victims and witnesses in connection with the criminal proceeding in which the restraining order is issued in order to allow participation without fear of reprisal.' " (*People v. Ponce* (2009) 173 Cal.App.4th 378, 383 (*Ponce*).) Accordingly, section 136.2 does not authorize a trial court to impose a postjudgment restraining order against a criminal defendant.

14

The People rely on *Townsel v. Superior Court* (1999) 20 Cal.4th 1084 (*Townsel*) to argue that the order was properly issued based on the court's inherent authority to protect the integrity of the judicial process. The People ignore that the court in *Ponce* already determined that *Townsel* does not support the conclusion that a court can issue a postjudgment protective order under section 136.2 based on its inherent authority.[2] *Ponce* noted that statutes regulating restraining orders were already in place and that "courts should use them and should normally refrain from exercising their inherent powers to invent alternatives." (*Ponce, supra,* 173 Cal.App.4th at p. 384.)

We agree with the reasoning in *Ponce*. The existing statutory provisions authorizing long-term protective orders set forth numerous procedural protections for those subject to them. (*Ponce, supra,* 173 Cal.App.4th at p. 383.) Consequently, "the Legislature intended a 'narrower scope' for section 136.2 orders" so that they would be limited to prejudgment proceedings. (*Ibid.*) If the duration were not so limited, *Ponce* reasoned, section 136.2 restraining orders would " 'usurp' " the restraining orders obtainable under other statutes and " 'undermine the numerous

---

[2]     *Townsel* held that a court can issue a protective order requiring appellate counsel to get approval from the court before contacting jurors in a death penalty case almost a decade after conviction. (*Townsel, supra,* 20 Cal.4th at p. 1097.) The court in *Townsel* determined that the order was authorized by the court's inherent power to protect the privacy and physical safety of jurors, noting the strong public interest in the integrity of our jury system. (*Id.* at pp. 1095, 1097.) *Townsel* makes no mention of section 136.2.

15

procedural protections for the restrainee afforded by that section.' " (*Ibid.*)

Here, unlike the court in *Townsel*, the protective order against Mirzakhanyan was not issued to protect the integrity of the judicial process; it was intended to protect the victims in this case. While it may have been reasonable—even warranted—for the People to seek court intervention to protect the victims, section 136.2 was not the proper vehicle for obtaining a postjudgment restraining order because that statute authorizes protective orders only during the pendency of the criminal proceedings. The protective order issued against Mirzakhanyan therefore "transcended the authorization of section 136.2" and must be vacated. (*People v. Stone* (2004) 123 Cal.App.4th 153, 160.)

IV. **Mirzakhanyan is Entitled to 12 Additional Days of Conduct Credit**

At sentencing, the court determined Mirzakhanyan had spent 350 days in pre-trial detention and awarded him 350 days credit for actual time spent in custody, which included time spent at Patton State Hospital. In addition to actual custody credit, a defendant may also accrue "conduct credits under . . . section 4019 for the period of incarceration prior to sentencing." (*People v. Kennedy* (2012) 209 Cal.App.4th 385, 395.) Under section 4019, a defendant can earn two conduct credits for every two actual credits. (*People v. Whitaker* (2015) 238 Cal.App.4th 1354, 1358.) There is, however, one exception relevant here.

16

An accused awaiting trial is generally not entitled to conduct credit for time spent in a state hospital subject to a finding of incompetence. (*People v. Waterman* (1986) 42 Cal.3d 565, 569.) Once competence is restored, however, a defendant is entitled to conduct credit for the time spent in a state hospital awaiting transfer to the county jail. (*People v. Bryant* (2009) 174 Cal.App.4th 175, 184.)

In determining the conduct credit to which Mirzakhanyan was entitled, the court subtracted the full 42 days he spent at Patton State Hospital from the 350 days actually served and awarded him 308 conduct credits. Mirzakhanyan alleges, the People concede, and we agree, that the court's calculation of conduct credit was erroneous. Here, of the 42 days Mirzakhanyan spent at Patton State Hospital, 12 were spent awaiting transfer to the county jail after he was declared competent. The court should have deducted only 30 days from his conduct credit rather than 42. Accordingly, Mirzakhanyan is entitled to a total of 320 days of conduct credit.

## DISPOSITION

The convictions are conditionally reversed for a limited remand with the following instructions:

If the trial court finds defendant suffers from a qualifying mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets all the statutory criteria set forth in section 1001.36, then the court may grant mental health diversion in accordance with the statutory scheme. If defendant successfully completes diversion, then the court shall dismiss the charges.

17

If, however, the trial court determines defendant does not meet the criteria under section 1001.36, or if defendant does not successfully complete mental health diversion, then his convictions and sentence shall be reinstated. In the event defendant's convictions and sentence are reinstated, the trial court shall issue an amended abstract of judgment awarding Mirzakhanyan additional 12 days of credit consistent with this opinion, for a total of 320 days of credit.

The section 136.2 protective order is vacated.

The judgment is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

BIGELOW, P. J.

WILEY, J.